**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WILDERNESS SOCIETY<br>1801 Pennsylvania Ave. NW, Suite 200<br>Washington, DC 20006<br><br>FRIENDS OF THE EARTH<br>1101 15th Street NW, 11th Floor<br>Washington, DC 20005<br><br>      *Plaintiffs*,<br>   v.<br><br>DEBRA HAALAND, in her official capacity as Secretary of the Interior<br>United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, NW<br>Washington, DC 20240<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT<br>1849 C Street, NW<br>Washington, DC 20240<br><br>      *Defendants*. | Case No. |

**COMPLAINT**

**INTRODUCTION**

1.      This case challenges the decision by Defendants Debra Haaland, the United States Department of the Interior, and the United States Bureau of Land Management (collectively, BLM) to sell oil and gas leases covering nearly 200 square miles of public lands in Wyoming without evaluating the resulting impacts to groundwater or wildlife, and without grappling with the greenhouse gas pollution caused by oil and gas development on those leases.

2.      BLM's June 2022 lease sale offered almost 120,000 acres for oil and gas development across the state of Wyoming.  These lands overlie underground sources of drinking water and cover big game migration corridors, as well as important habitat for the Greater sage-grouse.  BLM also estimates that greenhouse gas emissions resulting from oil and gas development on the leases would be equivalent to putting hundreds of thousands of gasoline-fueled passenger vehicles on the road every year.

3.      BLM, however, failed to address these impacts.  First, the agency did not evaluate the reasonably foreseeable impacts of oil and gas drilling on groundwater aquifers or consider measures to protect underground sources of drinking water from contamination—despite evidence in the record showing that oil and gas companies operating on federal land commonly fail to protect groundwater in Wyoming and other states.  Second, BLM's analysis does not assess reasonably foreseeable impacts to wildlife, including big game and the Greater sage-grouse, from development of those leases.

4.      Third, BLM failed to make a reasoned decision about how to address the lease sale's contribution to climate change.  The agency acknowledged that production and combustion of oil and gas developed on the leases would generate huge volumes of greenhouse gases and could result in <u>billions</u> of dollars in social and environmental costs.  But BLM never

1

explained why it chose to incur such enormous societal costs.  Nor did BLM consider whether the sale could be reconciled with the United States' commitments to reduce our country's contribution to climate change.  The agency also declined to consider the option of holding only a small lease sale in Wyoming, which would minimize these adverse impacts.  BLM's disregard of these issues was arbitrary and capricious and violated the National Environmental Policy Act (NEPA).

5.      BLM's failure to address the groundwater, wildlife, and climate impacts from the lease sale is especially glaring because the agency itself has acknowledged these problems.  Last year, the Biden Administration announced a broad review of the federal oil and gas program, as well as a temporary pause on new leasing while it considered reforms.  In this lease sale, however, BLM disregarded the flaws it has already acknowledged by failing to fully and rationally consider water, wildlife, and climate impacts resulting from its decision, and to consider reasonable alternatives that would protect those resources.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 702 (Administrative Procedure Act).

7.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs The Wilderness Society and Friends of the Earth are headquartered in this district, Defendant Secretary of the Interior Debra Haaland resides in this district, Defendant Interior Department is headquartered in this district, and Defendant BLM's national office is in this district.  In addition,

the events giving rise to this case occurred in this district, including Defendants' decision to offer the June 2022 lease sale.

## PARTIES

9.      Plaintiff THE WILDERNESS SOCIETY (TWS) is a national non-profit membership organization devoted to uniting people to protect the nation's wild places.  It contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations.  Founded in 1935, TWS is headquartered in Washington, D.C., with more than one million members and supporters nationwide, including numerous members in Wyoming.  TWS aims to transform federal land management to prioritize climate resilience and biodiversity protection and help develop and advance policies for just and equitable public land conservation on behalf of all people.  For years, TWS has advocated for reform of BLM's oil and gas leasing program.  TWS uses in-house science, policy, and legal expertise to comment on and engage in the oil and gas leasing process.

10.      Plaintiff FRIENDS OF THE EARTH (FoE) is a 501(c)(3) nonprofit, membership-based organization with headquarters in Washington, D.C. and Berkeley, California.  FoE currently has over 4.7 million activists and over 290,000 members, including 416 members in Wyoming.  FoE's primary mission is to defend the environment and champion a healthier and more just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights.  FoE is dedicated to fighting climate change and advocating for clean energy alternatives.  FoE directly engages in administrative and legal advocacy to protect the environment and society from climate change, pollution, and industrialization associated with fossil fuel development on public lands and associated

3

greenhouse gas emissions.  FoE fights to reduce greenhouse gas emissions and domestic reliance on fossil fuels and to advance justly-sourced renewable energy.

11.     Plaintiff groups' members live, work, and recreate in and around the federal lands at issue in this case.  They will be adversely affected and irreparably harmed by BLM's issuance of the oil and gas leases.  Oil and gas development on the leases will harm fish and wildlife that Plaintiffs and their members, including but not limited to TWS member Nathan Martin and FoE member Kevin Mahaffey, enjoy watching, hunting, and fishing.  That development also will degrade air quality and pollute and consume water resources used and enjoyed by Plaintiffs and their members.  Oil and gas development will also harm Plaintiffs and their members by increasing heavy truck traffic, noise, and light pollution, and destroying the natural beauty of lands that Mr. Martin, Mr. Mahaffey, and other members enjoy.  Plaintiffs and their respective members also have a substantial interest in ensuring that BLM complies with federal law, including the procedural requirements of NEPA and the Administrative Procedure Act.  Plaintiffs' injuries are actual and concrete and would be remedied by the relief sought in this case.

12.     Plaintiffs participated extensively in BLM's administrative process, including commenting on the NEPA analysis for the lease sale and filing administrative appeals (protests) of the sale.

13.     Defendant DEBRA HAALAND is the Secretary of the Interior.  Plaintiffs sue Secretary Haaland in her official capacity.  Secretary Haaland oversees oil and gas development on federal and tribal lands and is responsible for the oil and gas leasing decision challenged here.

14.     Defendant U.S. DEPARTMENT OF THE INTERIOR is an executive branch department and is the parent agency of the Bureau of Land Management.

15.     Defendant U.S. BUREAU OF LAND MANAGEMENT is an agency of the United States government in the Department of the Interior.  BLM is responsible for managing publicly owned lands and minerals in accordance with federal law.  BLM issued the decision challenged here.

## LEGAL FRAMEWORK

### I.     Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

16.     The Administrative Procedure Act (APA) authorizes judicial review of agency actions and provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law."  5 U.S.C. § 706.

17.     An agency acts arbitrarily and capriciously when it has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  A reviewing court applying these factors must "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors."  Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989) (internal citation omitted).

### II.     National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

18.     NEPA is the country's "basic national charter" for environmental protection. Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1177 (9th Cir. 2011) (internal citation omitted). It serves two goals: (a) fostering informed decision making by federal agencies, and (b) promoting informed public participation in government decisions.  Balt. Gas & Elec. Co. v. Nat.

Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).  To meet those goals, NEPA requires that

agencies "consider every significant aspect of the environmental impact of a proposed action"

and inform the public of the environmental impacts of agency proposals.  Id. (internal citation

omitted).

19.    Prior to undertaking any "major Federal action[] significantly affecting the quality

of the human environment," NEPA requires federal agencies to develop an Environmental

Impact Statement (EIS), which is a "detailed statement" explaining "the environmental impact of

the proposed action."  42 U.S.C. § 4332(2)(C).  An EIS is required if a proposed action "might"

significantly affect the environment.  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,

985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting Grand Canyon Trust v. Fed. Aviation Admin.,

290 F.3d 339, 340 (D.C. Cir. 2002)).  As long as "there are 'substantial questions' as to whether

an agency's actions will have a significant effect on the environment, then failure to prepare an

EIS is a violation of NEPA."  Fund for Animals v. Norton, 281 F. Supp. 2d 209, 232 (D.D.C.

2003); see also Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric., 681 F.2d 1172, 1178 (9th

Cir. 1982) ("A determination that significant effects on the human environment will in fact occur

is not essential.  If substantial questions are raised whether a project may have a significant effect

upon the human environment, an EIS must be prepared." (internal citation omitted)).

20.    When a proposed action will not have a significant effect, NEPA allows agencies

to prepare a shorter analysis called an Environmental Assessment (EA), along with a Finding of

No Significant Impact (FONSI).  40 C.F.R. § 1501.5(a) (EA); id. § 1501.6(a) (FONSI).

21.    NEPA requires an EIS or EA to discuss "alternatives to the proposed action."  42

U.S.C. § 4332(2)(C) (EIS); id. § 4332(2)(E) (EA).  The range of alternatives is "the heart" of the

NEPA analysis.  Union Neighbors United, Inc. v. Jewell, 831 F.3d 564, 575 (D.C. Cir. 2016)

(internal citation omitted).  Consideration of alternatives ensures that the decision maker "has before him and takes into proper account all possible approaches to a particular project," Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971), including those "that would avoid or minimize adverse impacts [to] . . . the human environment," 40 C.F.R. § 1502.1.  By requiring consideration of alternatives, NEPA aims to ensure that the "most intelligent, optimally beneficial decision will ultimately be made."  Calvert Cliffs, 449 F.2d at 1114.

22.    Agencies must "[e]valuate reasonable alternatives" and explain why any alternatives were eliminated.  40 C.F.R. § 1502.14(a).  "NEPA is premised on the assumption that all reasonable alternatives will be explored by the agency."  Concerned about Trident v. Rumsfeld, 555 F.2d 817, 825 (D.C. Cir. 1976).  An alternative is considered reasonable if it is "technically and economically practical or feasible and meet[s] the purpose and need of the proposed action."  Union Neighbors, 831 F.3d at 575 (internal citation omitted).  However, when a proposed action "is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened."  Nat. Res. Def. Council, Inc. v. Morton, 458 F.2d 827, 835 (D.C. Cir. 1972) (footnote omitted).

23.    Environmental analyses required by NEPA must be conducted at "the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions."  40 C.F.R. § 1501.2(a).  NEPA analyses "must be written early enough so that whatever information is contained can practically serve as an input into the decision making process."  Pub. Citizen, Inc. v. U.S. Nuclear Regul. Comm'n, 940 F.2d 679, 684 (D.C. Cir. 1991) (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1094 (D.C. Cir. 1973)).  The EA should thus "provide a springboard for public comment, bringing to

7

the agency viewpoints and options it might otherwise lack." <u>Ill. Com. Comm'n v. Interstate Com. Comm'n</u>, 848 F.2d 1246, 1260 (D.C. Cir. 1988).

24.     An agency's NEPA analysis must identify and address the direct, indirect, and cumulative impacts of its proposed action.  40 C.F.R. §§ 1501.5, 1502.16, 1508.1(g)(1)–(3).  Direct impacts are those "caused by the action and occur at the same time and place." <u>Id.</u> § 1508.1(g)(1).  Indirect impacts are "caused by the action and are later in time . . . but are still reasonably foreseeable." <u>Id.</u> § 1508.1(g)(2).

25.     The "cumulative effects" of a proposed action refers to:

> effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

<u>Id.</u> § 1508.1(g)(3).  NEPA obligates agencies to identify in a cumulative impacts analysis:

> (i) the area in which the effects of the proposed project will be felt; (ii) the impact expected in that area; (iii) those other actions—past, present, and proposed, and reasonably foreseeable that have had or will have impact in the same area; (iv) the effects of those other impacts; and (v) the overall impact that can be expected if the individual impacts are allowed to accumulate.

<u>Sierra Club v. Fed. Energy Regul. Comm'n</u>, 827 F.3d 36, 49 (D.C. Cir. 2016) (internal quotation omitted).  In other words, agencies "cannot treat the identified environmental concern in a vacuum." <u>Grand Canyon Trust</u>, 290 F.3d at 346.

26.     An adequate NEPA analysis requires more than conclusory statements because they "do not equip a decisionmaker to make an informed decision about alternative courses of action." <u>Nat. Res. Def. Council, Inc. v. Hodel</u>, 865 F.2d 288, 298 (D.C. Cir. 1988); <u>see also</u> <u>Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.</u>, 387 F.3d 989, 993–94 (9th Cir. 2004) (noting that general statements about possible effects "do not constitute a hard look absent

a justification regarding why more definitive information could not be provided" (internal citation omitted)).

BACKGROUND

I.     THE IMPACTS OF OIL AND GAS DRILLING

A.     Aquifers and Underground Sources of Drinking Water

27.     Groundwater is a critical resource that supplies many communities, particularly rural ones, with drinking water.  Oil and gas development can and does impact groundwater because it involves boring wells to depths thousands of feet below the surface, often through or just above aquifers.  Without proper well construction and vertical separation between aquifers and formations targeted for oil and gas development, drilling and production can contaminate underground sources of drinking water.

28.      In its Onshore Oil and Gas Order No. 2, BLM directs that oil and gas wells drilled on public lands shall "protect and/or isolate all usable water zones."  53 Fed. Reg. 46,798, 46,808 (Nov. 18, 1988).  Onshore Order No. 2 defines "usable water" that must be protected as groundwater containing less than 10,000 parts per million (ppm) of total dissolved solids.  Id. at 46,805.  This standard is based on the Safe Drinking Water Act definition of an "underground source of drinking water" as an aquifer with water that contains less than 10,000 mg/L (10,000 ppm) of total dissolved solids.  Id. at 46,798; see also 40 C.F.R. §§ 144.3, 146.3.  Onshore Oil and Gas Order No. 2 anticipates that BLM will use case-by-case analysis and information gathering to protect all usable waters: the Order does not prescribe specific procedures or testing requirements to comply with this obligation.

29.     Despite the requirements of Onshore Order No. 2, oil and gas companies often do not protect all usable water in practice.  Industry trade associations Western Energy Alliance and the Independent Petroleum Association of America (IPAA) have told BLM that the "existing

practice for locating and protecting usable water" does not comply with the 10,000 ppm standard in Onshore Order No. 2.  The two trade associations explained that actually requiring companies to protect all underground sources of drinking water would result in substantial additional costs for "casing and cementing associated with isolating formations that meet the numerical definition of usable water under the [Onshore Order No. 2 standard], but which are located at depths deeper than the zones that state agencies and BLM field offices have previously designated as requiring isolation."[1]

30.     Western Energy Alliance and IPAA also have indicated that companies typically do not measure the quality of underlying aquifers prior to their drilling operations, and therefore do not ensure all groundwater containing less than 10,000 ppm of dissolved solids will be protected.  Id. at 59.

31.     A recent sample of oil and gas well records in Wyoming confirms industry admissions that BLM well approvals and operator construction practices may not protect usable groundwater.  The survey found that a majority of the existing federal wells (36 of 61) reviewed in the vicinity of leases offered in the June sale lacked adequate construction to protect all usable water as required by Onshore Order No. 2.  Recent research in Montana and Colorado has reached similar conclusions.

32.     Hydraulic fracturing practices in Wyoming and elsewhere also threaten contamination of usable groundwater.  Hydraulic fracturing is an oil and gas drilling technique where operators inject hydraulic fracturing fluid—a mix of water, sand, and sometimes toxic chemicals such as formaldehyde—down a production well under pressure great enough to

---

[1] Independent Petroleum Association of America & Western Energy Alliance, Comments on RIN 1004-AE52 at 84 (Sept. 25, 2017), available at https://www.regulations.gov/document?D=BLM-2017-0001-0412.

fracture the oil- and gas-bearing rock.  Oil, gas, and other fluids then flow through the fractures and up the production well to the surface for collection.  Today, an estimated 90% of the oil and gas wells drilled on federal lands are hydraulically fractured.

33.     A 2016 Environmental Protection Agency (EPA) report reviewed the effect of hydraulic fracturing on groundwater.[2]  EPA's report found that in some areas there was no vertical separation between the hydraulically fractured rock formation and the bottom of the underground drinking water resource.  In other words, hydraulic fracturing is occurring directly into underground drinking water, or immediately adjacent to it.  In such cases, EPA concluded that hydraulic fracturing may introduce toxic fracturing fluid into formations that may currently serve, or in the future could serve, as a drinking water source for public or private use.

34.     A study of hydraulic fracturing in Pavillion, Wyoming, confirmed that oil and gas drilling had contaminated underground sources of drinking water due to a lack of vertical separation between the aquifer and target formation.  The study concluded that given how frequently hydraulic fracturing is employed, contamination of underground sources of drinking water from oil and gas drilling was unlikely to be limited to the Pavillion area.

35.     Climate change makes it even more imperative to protect potentially usable sources of groundwater.  The warming climate is expected to increase demand for groundwater in coming years as increased aridity and higher temperatures put greater pressure on current water sources.  EPA's 2016 report noted that the "existing distribution and abundance of the drinking water resources in the United States may not be sufficient in some locations to meet future demand.  The future availability of sources of drinking water that are considered fresh will likely

---

[2] See EPA, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States (Dec. 2016), available at www.epa.gov/hfstudy.

be affected by changes in climate and water use." Id. at 2-18.  As a result, aquifers not currently

being used for drinking water will likely be needed in coming decades.

### B.     Wildlife

36.     Oil and gas drilling also harms wildlife.  For example, Interior Department

research consistently identifies oil and gas development as one of the "primary threats" to

Greater sage-grouse.  Endangered and Threatened Wildlife and Plants, 80 Fed. Reg. 59,858,

59,858 (Oct. 2, 2015).  BLM's National Technical Team, a team of the agency's scientific

experts, reported in 2011 that impacts to grouse from oil and gas development "are universally

negative and typically severe."[3]  The roads, power lines, waste pits, and other disturbances

associated with oil and gas development all affect grouse populations and their breeding success.

Studies have found that Greater sage-grouse "[b]reeding populations are severely reduced at [oil

and gas] well pad densities commonly permitted."  Id. at 19.

37.     In recent decades, Greater sage-grouse populations have declined dramatically in

Wyoming and other western states.[4]  Today, the grouse population stands at less than 20% of its

1965 population.[5]  While historic accounts reported flocks of sage-grouse so large they darkened

the skies when taking flight, these have not occurred for decades.

---

[3] Sage-Grouse National Technical Team, A Report on National Greater Sage-Grouse
Conservation Measures at 18–24 (Dec. 21, 2011) (Sage-Grouse National Technical Team
Report).
[4] D.J. Manier et al., Summary of Science, Activities, Programs, and Policies that Influence the
Rangewide Conservation of Greater Sage-Grouse, Open-File Report 2013-1098, U.S. Geological
Survey 11, 16 tbl.2 (2013), https://pubs.usgs.gov/of/2013/1098/OF13-1098.pdf.
[5] Peter S. Coates et al., Range-wide Greater Sage-Grouse Hierarchical Monitoring Framework:
Implications for Defining Population Boundaries, Trend Estimation, and a Targeted Annual
Warning System, Open-File Report 2020-1154, U.S. Geological Survey 3 (2020),
https://pubs.usgs.gov/of/2020/1154/ofr20201154.pdf (concluding that sage grouse populations
have declined 80.7% since 1965).

38.     Oil and gas development also adversely affects big game species such as mule deer, pronghorn, and elk.  Mule deer and pronghorn herds range throughout Wyoming, but a number of herd units have not been meeting population objectives for several years.[6]  These animals rely on migration corridors during seasonal transition times; the "loss of the ability to migrate has led to sudden and dramatic declines in animal populations."  Id. at 81 (internal citation omitted).

C.     **Climate Change**

39.     Climate change is scientifically established as a real and significant threat to the environment and society.  The Intergovernmental Panel on Climate Change warned in its Climate Change 2014 Synthesis Report that "[c]ontinued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, including the likelihood of severe, pervasive and irreversible impacts for people and ecosystems."[7]  The U.S. Global Change Research Program repeated this warning in 2017 in its report Climate Science Special Report: Fourth National Climate Assessment, Volume I: "There is broad consensus that the further and the faster the Earth system is pushed towards warming, the greater the risk of unanticipated changes and impacts, some of which are potentially large and irreversible."[8]

---

[6] Bureau of Land Mgmt., Environmental Assessment: 2022 Second Quarter Competitive Lease Sale, DOI-BLM-WY-0000-2021-0003-EA, at 78 (June 28, 2022) [hereinafter EA], https://eplanning.blm.gov/public_projects/2015621/200495701/20062447/250068629/2022-06%20Wyoming%20Competitive%20Lease%20Sale%20EA.pdf.

[7] Rajendra Pachauri et al., Climate Change 2014 Synthesis Report, Intergovernmental Panel on Climate Change, at Summary for Policymakers 8 (2014), https://www.ipcc.ch/site/assets/uploads/2018/02/SYR_AR5_FINAL_full.pdf.

[8] Donald J. Wuebbles et al., Climate Science Special Report: Fourth National Climate Assessment, Volume I, U.S. Global Change Rsch. Program, at 11 (2017), https://science2017.globalchange.gov/downloads/CSSR2017_FullReport.pdf.

40.     The Interior Department has acknowledged the need to address climate change

when making management decisions on federal lands.  Interior Secretarial Order 3289,

Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and

Cultural Resources (Sept. 14, 2009), stated that "the realities of climate change require us to

change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands

and resources we oversee"; and acknowledged that the Department of the Interior is "responsible

for helping protect the nation from the impacts of climate change."  And in 2021, the Secretary

recognized that the "Nation faces a profound climate crisis," ordering the Interior Department to

"prioritize[ ] action on climate change."  Interior Secretarial Order 3399, Department-Wide

Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-

Making Process (April 16, 2021).

41.     President Biden also has recognized the need for action, stating that the "United

States and the world face a profound climate crisis.  We have a narrow moment to pursue action .

. . in order to avoid the most catastrophic impacts of that crisis."  Exec. Order No. 14008,

Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619, 7,619 (Jan. 27, 2021).

The United States, in fact, committed in 2021 to reduce the nation's greenhouse gas emissions

50–52% by 2030.[9]

42.     A fundamental disconnect exists, however, between the federal government's

commitment to address climate change, and how public lands are managed for energy

production.  A recent paper calculates that lifecycle emissions from federal fossil fuel

development resulted in an average of 1,408 million metric tons (MMT) of Carbon Dioxide-

---

[9] U.S. Dep't of State & U.S. Exec. Office of the President, The Long-Term Strategy of the
United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050, at 1 (Nov. 2021),
https://www.whitehouse.gov/wp-content/uploads/2021/10/US-Long-Term-Strategy.pdf.

equivalent (CO2e) per year since 2005—the equivalent of 377 coal-fired power plants, or the emissions from 303 million cars—and are projected to be around 1,130 MMT CO2e by 2030.[10] These emissions will amount to around 20% of total U.S. emissions each year.  Id. at 6 fig.2. Existing BLM land management plans, however, largely fail to address these climate impacts.

## II.    PRESIDENT BIDEN'S DIRECTIVE TO PAUSE LEASING PENDING A COMPREHENSIVE REVIEW, AND SUBSEQUENT LOUISIANA COURT INJUNCTION

43.    The federal oil and gas program suffers from numerous well-documented problems, including practices that exacerbate the adverse impacts described above.  The Government Accountability Office (GAO) has repeatedly criticized BLM and its parent agency, the Interior Department, for poor regulatory oversight and enforcement, for fiscal terms that shortchange taxpayers, and for allowing abuses of the leasing process by oil and gas companies. In recent years, courts also have invalidated numerous BLM lease sales for failure to address the impacts of those sales on climate, groundwater, wildlife, and other resources.  See, e.g., W. Watersheds Proj. v. Bernhardt, 543 F. Supp. 3d 958 (D. Idaho 2021) (sage-grouse); WildEarth Guardians v. U.S. Bureau of Land Mgmt., 457 F. Supp. 3d 880 (D. Mont. 2020) (groundwater and climate change); WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41 (D.D.C. 2019) (greenhouse gas impacts); Rocky Mountain Wild v. Haaland, Civ. No. 18-cv-02468-MSK, 2021 WL 4438032 (D. Colo. Sept. 28, 2021) (wilderness-quality lands).

44.    Responding to these systemic flaws, President Biden on January 27, 2021, ordered a temporary pause on new oil and gas leasing to allow the Interior Department time to conduct a "comprehensive review" of the federal oil and gas program.  86 Fed. Reg. at 7,624–25.

---

[10] N. Ratledge et al., Emissions from Fossil Fuels Produced on US Federal Lands and Waters Present Opportunities for Climate Mitigation, 171 Climatic Change, no. 11, Mar. 14, 2022, at 2– 5, https://link.springer.com/content/pdf/10.1007/s10584-021-03302-x.pdf.

The President issued this directive "in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands . . . including potential climate and other impacts." Id.

45.     BLM subsequently explained that "[i]n recent years, courts have found the current leasing process in violation of various governing laws, invalidating both the BLM's guidance and a number of lease sales."[11]  BLM announced its plans to "analyze and ensure that any future leasing complies with applicable law—including requirements for evaluating greenhouse gas emissions and climate change impacts—to better withstand administrative and judicial review." Id.  BLM further anticipated that the "comprehensive review required by [Executive Order] 14008 has the potential to identify and recommend solutions for serious deficiencies in the leasing regime." Id.

46.     In June 2021, however, the U.S. District Court for the Western District of Louisiana issued a preliminary injunction blocking implementation of a nationwide "Pause" on oil and gas leasing as contemplated by President Biden's Executive Order 14008.  Louisiana v. Biden, 543 F. Supp. 3d 388 (W.D. La. 2021), appeal docketed, No. 21-30505 (5th Cir. Aug. 17, 2021).  The court distinguished a nationwide moratorium from lease sale postponements for sale-specific or environmental concerns.  The Court expressly recognized that BLM has authority to postpone or cancel a given lease sale for environmental concerns over that sale.  The court thus did not require that BLM must conduct any particular lease sales; instead, it ruled only that BLM could not cancel a lease sale "for no reason other than to do a comprehensive review pursuant to Executive Order 14008." Id. at 410.

---

[11] Bureau of Land Mgmt., Statement on Second Quarter Oil and Gas Lease Sales (Apr. 21, 2021), available at https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales.

### III.     BLM OFFERS NUMEROUS OIL AND GAS LEASES IN WYOMING

47.     BLM responded to the <u>Louisiana</u> court order by restarting oil and gas lease sales across the West.  Following the <u>Louisiana</u> Order, the Interior Department reported to that court on August 24, 2021 that BLM offices across the country had been directed to move forward with preparation to hold new lease sales.  Defs.' Mem. Opp'n Pls.' Mot. at 5, <u>Louisiana v. Biden</u>, No. 2:21-CV-00778 (W.D. La. Aug. 24, 2021), ECF No. 155.  After preparing NEPA documents and taking public comment, Defendant Secretary of the Interior Debra Haaland announced on April 15, 2022, that sales would be held offering leases in eight western states in June 2022.

48.     Most of those sales are quite small, involving only a handful of leases.  The Wyoming sale is the exception:  BLM offered 123 parcels covering almost 120,000 acres (roughly 188 square miles) in that state.  In contrast, the agency is offering a combined total of less than 10,000 acres in the other seven states.

49.     BLM, however, has not completed the comprehensive review of the federal oil and gas program contemplated by President Biden, and it is moving forward with leasing without addressing many of the problems that warranted that review in the first place.  The large lease sale offered in Wyoming would lock in extensive oil and gas development rights before BLM can develop and implement necessary programmatic reforms.

50.     In its Wyoming sale, moreover, BLM continued many of the same errors that courts have held to violate NEPA, and that led the Federal Defendants to recognize that reforms were necessary.

51.     For example, BLM has not reconciled its leasing decision with national climate goals.  While BLM's EA provides additional discussion of climate impacts, that analysis reveals that development of the leases will result in enormous social and environmental costs.  The EA

finds that the social and environmental costs caused by greenhouse gases expected to be emitted

from development of the proposed leases may run into the billions of dollars.[12]  But BLM never

explained why it chose to incur such enormous societal costs.  For example, the EA does not

discuss whether there might be any benefits from the lease sale that warrant incurring those

enormous costs.  Nor did the EA consider whether the Wyoming sale is consistent with U.S.

climate commitments.  To the contrary, BLM stated that it was disregarding those costs in

making its decision.  The agency asserted that its findings of huge social and environmental costs

were "for informational purposes only," and were not a "basis for our decision-making."[13]

52.     Despite the billions of dollars in anticipated social and environmental costs

resulting from the lease sale, BLM issued a Finding of No Significant Impact (FONSI),

concluding that a full EIS was not required because "the EA did not identify any significant

effects."[14]  In doing so, however, BLM declined to assess – and claimed it lacked the data to

assess – the significance of the sale's greenhouse gas (GHG) emissions, despite finding that no

significant impacts would result.  BLM also declined to assess the cumulative impacts from the

Wyoming sale in combination with impacts from the other June lease sales in different states.

53.     BLM also ignored the impacts of the lease sale on underground sources of

drinking water.  The administrative record documents that numerous leases overlie usable

groundwater.  The EA, however, contains only generic boilerplate text about potential water

---

[12] EA, supra note 6, at 40.

[13] Bureau of Land Mgmt., Decision Record, DOI-BLM-WY-0000-2021-0003-EA, at 1 (June 28, 2022),
https://eplanning.blm.gov/public_projects/2015621/200495701/20062454/250068636/2022-06%20Wyoming%20Competitive%20Lease%20Sale%20DR.pdf.

[14] Bureau of Land Mgmt., Finding of No Significant Impact: 2022 Second Quarter Competitive Lease Sale, DOI-BLM-WY-0000-2021-0003-EA, at 6 (June 28, 2022),
https://eplanning.blm.gov/public_projects/2015621/200495701/20062453/250068635/2022-06%20Wyoming%20Competitive%20Lease%20Sale%20FONSI.pdf.

resource impacts from oil and gas development, and then asserts that groundwater protections will be addressed later, when applications for permits to drill (APD) on the leases are filed.[15] BLM's deferral of the issue until later, moreover, ignored the record evidence (described above) documenting that adequate groundwater protections often are <u>not</u> required as part of APD approvals, and that BLM often does not comply with its own requirements under Onshore Order No. 2.  It also was entirely feasible for BLM to take a hard look at foreseeable water resource impacts before making its leasing decision.

54.    BLM also failed to analyze and disclose the reasonably foreseeable impacts of its leasing decision on wildlife, including big game and the Greater sage-grouse.  Notably, BLM is currently in the process of reviewing and amending its 2015 Greater Sage-Grouse Resource Management Plan Amendments to address changed conditions and new information since 2015, which includes the U.S. Geological Survey's finding of alarming declines of sage-grouse populations range-wide.  <u>See</u> <u>Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare Associated Environmental Impact Statements</u>, 86 Fed. Reg. 66,331 (Nov. 22, 2021).  The Wyoming lease sale would lock in extensive oil and gas development rights before the amendments are complete, harming the Greater sage-grouse.

55.    Further, BLM failed to consider the reasonable alternative of holding a smaller lease sale in Wyoming.  In every other state, BLM considered—and ultimately chose to hold—a June 2022 sale offering only a small handful of leases.  In the seven other states where BLM is selling leases (Colorado, Utah, Montana, North Dakota, Nevada, New Mexico, and Oklahoma), BLM is offering a combined total of less than 10,000 acres.  In Wyoming, BLM declined to consider a similar scale of leasing.  Instead, the Wyoming EA considers only two alternatives

---

[15] <u>EA</u>, <u>supra</u> note 6, at 42–45.

each offering hundreds of thousands of acres, and a "no action alternative" holding no lease sale at all.  BLM inexplicably failed to consider a reasonable alternative of holding a small lease sale in Wyoming, as it is doing in every other state.  In addition, BLM has offered no reasoned explanation for why it is taking such a dramatically different tack in Wyoming.

## FIRST CLAIM FOR RELIEF

## (Violation of NEPA – Failure to Analyze and Disclose Reasonably Foreseeable Impacts to Groundwater)

56.     The allegations in all preceding paragraphs are incorporated by reference.

57.     NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals.  Balt. Gas & Elec. Co., 462 U.S. at 97 (internal citation omitted).

58.     Defendants have failed to analyze the reasonably foreseeable impacts to groundwater resources from the Wyoming lease sale, such as potential contamination of underground sources of drinking water due to inadequate well construction or hydraulic fracturing in or near those aquifers.  The EA that BLM prepared for the lease sale fails to analyze the groundwater impacts of oil and gas development on the leases being offered, instead offering only boilerplate text with generic statements about water resource impacts from oil and gas development.  Such conclusory statements fail to satisfy NEPA because they "do not equip a decisionmaker to make an informed decision about alternative courses of action."  Hodel, 865 F.2d at 298; see also Conserv. Cong. v. Finley, 774 F.3d 611, 621 (9th Cir. 2014) ("General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." (internal citation omitted)).

20

59.     BLM's decision to hold the Wyoming lease sale violated NEPA and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### (Violation of NEPA – Failure to Analyze and Disclose Reasonably Foreseeable Impacts to Wildlife)

60.     The allegations in all preceding paragraphs are incorporated by reference.

61.     NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals.  Balt. Gas & Elec. Co., 462 U.S. at 97 (internal citation omitted).

62.     Defendants have failed to analyze the reasonably foreseeable impacts to wildlife, such as disruption of big game migration corridors and harm to Greater sage-grouse populations, from oil and gas development on the leases being sold at the Wyoming sale.

63.     BLM's decision to hold the Wyoming lease sale violated NEPA and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF

### (Violation of APA, NEPA – Failure to Rationally Address Impacts to Climate)

64.     The allegations in all preceding paragraphs are incorporated by reference.

65.     The APA requires courts to set aside arbitrary and capricious agency decisions.  5 U.S.C. § 706(2)(A).  An action is arbitrary and capricious "if the agency has  . . . failed to consider an important aspect of the problem."  State Farm, 463 U.S. at 43 (1983).

66.     The Wyoming lease sale EA projects that foreseeable development on the leases it is selling will cause billions of dollars in social and environmental harms.  But BLM never explained why it chose to incur such enormous societal costs, or how its cost analysis informed the agency's decision making.  For example, the EA does not discuss whether there might be any benefits from the lease sale that warrant incurring those enormous costs.  Instead, the agency stated that it was disregarding climate impacts in making its leasing decision.

67.     BLM also failed to consider and address whether the lease sale is consistent with U.S. climate commitments and national policy.

68.     BLM's analysis violated NEPA and was arbitrary and capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### (Violation of NEPA – Failure to Prepare EIS)

69.     The allegations in all preceding paragraphs are incorporated by reference.

70.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

71.     BLM's Wyoming lease sale represented a major federal action significantly affecting the quality of the human environment.  The lease sale offered over a hundred thousand acres for oil and gas development, which will have a significant negative impact on climate change, groundwater, wildlife, and other resources.  In light of these reasonably foreseeable impacts, BLM's issuance of a FONSI for the sale was arbitrary and capricious.

72.     Moreover, in assessing the significance of impacts from the Wyoming lease sale, BLM failed to consider the cumulative impacts of that sale in combination with other reasonably foreseeable actions, including the lease sales being held concurrently in several other states. BLM's Wyoming lease sale is part of a larger national decision to resume oil and gas lease sales. The cumulative climate impacts of BLM's resumption of those sales will be significant and must be discussed in the same EIS.

73.     BLM's failure to prepare an EIS for the Wyoming lease sale violated NEPA and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

### (Violation of NEPA – Failure to Consider Range of Reasonable Alternatives)

74.     The allegations in all preceding paragraphs are incorporated by reference.

75.     NEPA requires an EIS or EA to discuss "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C), (E); see Union Neighbors, 831 F.3d at 575.

76.     In the EA for the Wyoming lease sale, BLM considered three options: the no-action alternative (offering no leases at all), an alternative offering virtually every lease parcel proposed by oil and gas companies (totaling 455 parcels and approximately 530,977.78 acres), and an alternative offering 195 leases covering approximately 179,001 acres.

77.     These do not represent a range of reasonable alternatives.  BLM failed to analyze any option involving only a small lease sale, on the scale of what BLM offered in every other state.  BLM also failed to consider other reasonable alternatives, such as an alternative with additional lease stipulations to ensure protection of groundwater.

78.     Because BLM has not evaluated these reasonable alternatives, the lease sale violated NEPA and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF

### (Violation of APA – Arbitrary and Capricious Treatment of
### Wyoming Lease Sales as Compared to Other States)

79.     The allegations in all preceding paragraphs are incorporated by reference.

80.     The APA requires agencies to explain their decisions, including decisions that involve differential treatment.  See Chamber of Com. v. Fed. Election Comm'n, 69 F.3d 600, 606 (D.C. Cir. 1995) (decision was arbitrary and capricious where agency provided "no explanation" for "differential treatment" of two classes of persons).

81.     The size and adverse impacts from the Wyoming lease sale dwarf the other sales BLM is holding in June 2022.  In every other state, BLM is responding to the Louisiana order by offering a small handful of leases for sale.  BLM has offered no reasoned explanation for why it has taken a dramatically different tack in Wyoming.

82.     BLM also applied lease selection criteria differently in Wyoming than it did in all the other sales, without explaining why it was doing so.

83.     BLM's differential treatment of the Wyoming lease sale and lack of explanation for that treatment was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.      Issue a declaratory judgment that Defendants violated NEPA, and acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority by holding the Wyoming lease sale discussed above;

2.      Set aside the decision record approving the Wyoming lease sale as well as its supporting EA and FONSI, and all leases sold in the challenged sale;

3.      Award Plaintiffs' costs, expenses, and reasonable attorney fees; and

4.      Provide such other relief as the Court deems just and proper.

Dated: June 29, 2022                        Respectfully submitted,

                                            /s/ Seth L. Johnson_____
                                            Seth L. Johnson (D.C. Bar No. 1001654)
                                            Earthjustice
                                            1001 G St. NW, Suite 1000
                                            Washington, DC 20001
                                            Tel.: (202) 797-5245
                                            E-mail: sjohnson@earthjustice.org

                                            *Local Counsel for Plaintiffs The Wilderness Society
                                            and Friends of the Earth*

                                            /s/ Michael S. Freeman_____
                                            Michael S. Freeman
                                            (CO Bar No. 30007) (*pro hac vice pending*)
                                            Earthjustice
                                            633 17th Street, Suite 1600
                                            Denver, CO 80202
                                            Tel.: (303) 996-9615
                                            E-mail: mfreeman@earthjustice.org

                                            *Counsel for Plaintiffs The Wilderness Society and
                                            Friends of the Earth*

                                            /s/ Alexandra Oakley Schluntz_____
                                            Alexandra Oakey Schluntz
                                            (CO Bar No. 56175) (*pro hac vice pending*)
                                            Earthjustice
                                            633 17th Street, Suite 1600
                                            Denver, CO 80202
                                            Tel.: (303) 996-9612
                                            E-mail: aschluntz@earthjustice.org

                                            *Counsel for Plaintiffs The Wilderness Society and
                                            Friends of the Earth*