Shannon Leininger, WSB #8-6932
Assistant Attorney General
Travis Jordan, WSB # 7-5721
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov
shannon.leininger@wyo.gov

*Attorneys for Intervenor-Defendant State of Wyoming*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*, | Case No.: 1:22-cv-01871-CRC |
| Plaintiffs, | |
| v. | **STATE OF WYOMING'S MEMORANDUM IN SUPPORT OF ITS RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT** |
| DEBRA HAALAND, *et al.,* | |
| Defendants, | |
| and | |
| STATE OF WYOMING, | |
| Intervenor-Defendant. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

GLOSSARY ............................................................................................................ vii

INTRODUCTION  ..................................................................................................... 1

BACKGROUND ........................................................................................................ 1

    I.      Legal Framework ........................................................................................ 1

    II.     The Bureau's June 2022 Wyoming Oil and Gas Lease Sale ................................. 3

    III.    Federal Regulation of Oil and Gas Operations ......................................... 6

        A.      The Bureau uses a three-stage process to manage oil and gas leasing ........................................................................................... 6

        B.      Multiple federal authorities protect water quality...................................... 8

    IV.    State Regulation of Oil and Gas Operations in Wyoming...................................... 9

        A.      The Wyoming Oil and Gas Conservation Commission regulates oil and gas operations in Wyoming.................................................................. 9

        B.      Wyoming regulates air quality, water quality, water quantity, and wildlife ............................................................................................... 10

                1.      Wyoming regulates air quality...................................................... 10

                2.      Wyoming regulates water quality and water quantity .................. 11

                3.      Wyoming regulates wildlife........................................................... 11

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT ................................................................................................... 13

I.  The Bureau's June 2022 Lease Sale was Consistent with the Applicable RMPs .................................................................................................... 14

II.  The Bureau Took a Hard Look at Environmental Impacts ................... 17

A.  The Bureau was not arbitrary and capricious in relying on federal and state regulations to analyze climate impacts ...................................... 19

1.  Wyoming has extensive regulatory mechanisms to protect groundwater ................................................................................ 19

B.  The Bureau was not arbitrary and capricious in deferring site-specific analysis to the APD stage ............................................ 21

C.  The Bureau considered the available science ........................................... 22

1.  The evidence used by the agency satisfies the hard look requirement .................................................................................. 22

2.  The Bureau properly weighed the facts in the record ................... 26

CONCLUSION ............................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Big Piney Oil & Gas Co. v. Wyo. Oil & Gas Conservation Comm'n*,
  715 P.2d 557 (Wyo. 1986) ................................................................. 20

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ........................................................................ 13

*Citizens for Resp. & Ethics in Washington v. SEC*,
  916 F.Supp.2d 141 (D.D.C. 2013) ..................................................... 29

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ............................................................. 2, 17, 25

*Forest Guardians v. U.S. Forest Serv.*,
  495 F.3d 1162 (10th Cir. 2007) ......................................................... 18

*Grunewald v. Jarvis*,
  776 F.3d 893 (D.C. Cir. 2015) ............................................................ 2

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) .................................................. 2, 29, 30

*Indian River Cnty., Fla. v. U.S. Dep't of Transp.*,
  945 F.3d 515 (D.C. Cir. 2019) .......................................................... 13

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................... 13, 30

*Native Ecosystems Council v. Erickson*,
  330 F.Supp.3d 1218 (D. Mont. 2018) ................................................ 23

*New Mexico ex rel. Richardson v. BLM*,
  565 F.3d 683 (10th Cir. 2009) ..................................................... 23, 29

*O'Brien v. State*,
  711 P.2d 1144 (Wyo. 1986) .............................................................. 11

*Powder River Basin Res. Council v. BLM*,
  37 F.Supp.3d 59 (D.D.C. 2014) ........................................................ 25

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................................ 13

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016) ................................................................................. 2, 25

*Sierra Club v. Peterson*,
    717 F.2d 1409 (D.C. Cir. 1983) ................................................................................. 18

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    744 F.Supp.2d 151 (D.D.C. 2010) ............................................................................. 15

*TOMAC v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ................................................................................... 23

*Utah Env't Cong. v. Russell*,
    518 F.3d 817 (10th Cir. 2008) ................................................................................... 23

*W. Org. of Res. Councils v. Zinke*,
    892 F.3d 1234 (D.C. Cir. 2018) ................................................................................... 2

*Wall v. Midland Carbon Co.*,
    254 U.S. 300 (1920) ................................................................................................. 20

*WildEarth Guardians v. BLM*,
    457 F.Supp.3d 880 (2020) ........................................................................................ 29

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ................................................................................ 2, 26

*WildEarth Guardians v. Zinke*,
    368 F.Supp.3d 41 (D.D.C. 2019) ............................................................................. 2, 7

**Statutes**

5 U.S.C. § 706 ............................................................................................................ 13

30 U.S.C. § 191 ........................................................................................................ 5, 6

30 U.S.C. § 226 ........................................................................................................ 3, 8

42 U.S.C. § 7401 ........................................................................................................ 10

42 U.S.C. § 7410 ........................................................................................................ 11

43 U.S.C. § 1712 ...................................................................................................... 6, 7

Wyo. Stat. Ann. § 9-4-601 ............................................................................................ 6

Wyo. Stat. Ann. § 21-13-207 ........................................................................................ 6

Wyo. Stat. Ann. § 23-1-101 ........................................................................... 11

Wyo. Stat. Ann. § 23-1-103 ........................................................................... 11

*Wyo. Stat. Ann. § 30-5-104 ..................................................................... 9, 20

Wyo. Stat. Ann. § 35-11-202 ......................................................................... 11

Wyo. Stat. Ann. § 35-11-801 .................................................................... 11, 19

Wyo. Stat. Ann. § 39-13-102 ........................................................................... 6

Wyo. Stat. Ann. § 39-13-111 ........................................................................... 6

Wyo. Stat. Ann. §§ 39-14-203 through -204 ................................................... 6

Wyo. Stat. Ann. § 41-3-938 ........................................................................... 11

**Rules**

*Rules Wyo. Game & Fish Comm'n*, ch. 11, § 3 ........................................... 12

*Rules, Off. of Land & Invs., Bd. of Land Comm'rs,* ch. 29 § 7 ..................... 13

*Rules, Wyo. Dep't of Env't Quality, Air Quality,* ch. 2 ................................. 11

*\*Rules, Wyo. Dep't of Env't Quality, Air Quality,* ch. 6 ........................ 11, 19

*\*Rules, Wyo. Dep't of Env't Quality, Water Quality,* ch. 2, §§ 4-6 ......... 11, 19

*Rules, Wyo. Oil & Gas Conservation Comm'n,* ch. 3 ................................... 19

*Rules, Wyo. Oil & Gas Conservation Comm'n,* ch. 3, § 4 .............................. 9

*\*Rules, Wyo. Oil & Gas Conservation Comm'n ch. 3, § 8* ................. 9, 13, 19

*Rules, Wyo. Oil & Gas Conservation Comm'n ch. 3, § 22* ............................. 9

*Rules, Wyo. Oil & Gas Conservation Comm'n  ch. 3, § 23* ......................... 10

*Rules, Wyo. Oil & Gas Conservation Comm'n ch. 3, § 25* ........................... 10

*Rules, Wyo. Oil & Gas Conservation Comm'n ch. 3, § 45* ........................... 10

*\*Rules, Wyo. Oil & Gas Conservation Comm'n ch. 3, § 46* ........................ 10

*Rules, Wyo. Oil & Gas Conservation Comm'n,* ch. 4 ................................... 19

*Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 4, § 1 ................................................. 9, 11, 19

**Regulations**

40 C.F.R. § 52.2620 ................................................................................................. 11

40 C.F.R. § 144.7 ................................................................................................. 8, 20

40 C.F.R. § 144.8 ................................................................................................. 8, 20

40 C.F.R. § 1500.1 (2020) ................................................................................ 3, 18, 31

40 C.F.R. § 1501.3 (2020) ................................................................................... 1, 22

40 C.F.R. § 1501.5 (2020) ................................................................................... 2, 22

40 C.F.R. § 1501.11 (2020) ...................................................................................... 21

43 C.F.R. § 1601.0-5 ................................................................................................. 6

43 C.F.R. § 3120.5-1 ................................................................................................. 7

43 C.F.R. § 3120.5-3 ................................................................................................. 7

43 C.F.R. § 3162.3-1 ........................................................................................ 7, 8, 19

43 C.F.R. § 3162.4-2 ............................................................................................ 8, 20

43 C.F.R. § 3162.5-1 ................................................................................................. 8

43 C.F.R. § 3162.5-2 ............................................................................................ 8, 20

Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015
Rule, 82 Fed. Reg. 61924 (Dec. 29, 2017) ........................................................ 14, 21

Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Onshore Oil
and Gas Order No. 2, Drilling Operations, 53 Fed. Reg. 46798 (Nov. 18, 1988) ...................... 9

**Other Authorities**

Wyo. Exec. Order No. 2011-5, *Greater Sage-Grouse Core Area Protection*, (June 2, 2011) ..... 12

Wyo. Exec. Order No. 2015-4, *Greater Sage-Grouse Core Area Protection*,
(July 29, 2015) ....................................................................................................... 12

**GLOSSARY**

Application to Drill ............................................................................................................. APD

Administrative Procedure Act .............................................................................................. APA

Environmental Assessment .................................................................................................... EA

Environmental Impact Statement ......................................................................................... EIS

Environmental Protection Agency ........................................................................................ EPA

Expression of Interest ............................................................................................................ EOI

Federal Land Policy and Management Act ......................................................................... FLPMA

Final Environmental Impact Statement ................................................................................ FEIS

Finding of No Significant Impact .......................................................................................... FONSI

General Habitat Management Area ....................................................................................... GHMA

Mineral Leasing Act ............................................................................................................. MLA

National Environmental Policy Act ....................................................................................... NEPA

Priority Habitat Management Area ....................................................................................... PHMA

Resource Management Plan .................................................................................................. RMP

Record of Decision ............................................................................................................... ROD

Secretary of the Interior ................................................................................................. Secretary

The Wilderness Society and Friends of Earth .................................................................... Groups

Total Dissolved Solids .......................................................................................................... TDS

**INTRODUCTION**

In June 2022, the Bureau conducted an oil and gas lease sale in Wyoming. (*See* WY485953). The Groups challenge that lease sale, alleging inconsistencies across several different states and citing only isolated portions of state and federal regulation. But the Groups willfully ignore the applicable federal RMPs and applicable State regulations that protect environmental quality, which were incorporated into the Bureau's analysis. First, the Groups challenge the inconsistency of the Bureau's approach to the June 2022 lease sale in Wyoming compared to other states. (*See* ECF No. 27-2 at 32-40). Second, the Groups challenge the EA's analysis of the impacts to groundwater, wildlife, and greenhouse gas emissions. (*See* ECF No. 27-2 at 17-31, 40-45). Both of the Groups' claims wholly disregard Wyoming's role in regulating oil and gas operations, as well as Wyoming regulation that protects air quality, water quality, water quantity, and wildlife. Because the Bureau properly took a "hard look" at the foreseeable environmental consequences of the challenged lease sale and made a fully informed decision, this Court should deny the Groups' petition.

**BACKGROUND**

**I.    Legal Framework**

NEPA governs an agency's preparation of an environmental analysis. An agency may prepare an EA to determine if an EIS is needed. *See* 40 C.F.R. § 1501.3(a) (2020).[1] An EA is "a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for

---

[1] Wyoming incorporates by reference the Bureau's explanation of the history of CEQ's regulations for NEPA. (*See* ECF No. 30 at 2 n.1). Wyoming also relies on the 2020 Regulations and the subsequent 2022 amendment, which were in effect while the Bureau was undergoing its decision-making process for the June 2022 lease sale. (*See id.*).

1

determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (alterations in original) (quoting 40 C.F.R. § 1508.9(a)).[2]

NEPA "requires the government to 'take a "hard look" at the reasonably foreseeable impacts of a proposed major federal action.'" *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (citation omitted). "Tiering allows an agency to meet its NEPA obligations in steps[.]" *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir. 2018) (alteration added). When tiering "the agency first publishes a programmatic EIS to assess 'the broad environmental consequences attendant upon a wide-ranging federal program.'" *Gulf Restoration Network*, 47 F.4th at 799 (citation omitted). "It later issues 'narrower EISs analyzing the incremental impacts of each specific action taken as part of a program.'" *Id.* at 799 (internal citation and citation omitted).

NEPA requirements are procedural and do not require a particular result. *See Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) (explaining that, "[a]s a procedural statute, NEPA does not mandate any particular outcome") (alteration added). NEPA also does not "require agencies to elevate environmental concerns over other appropriate considerations[.]" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (citation omitted) (alteration added). "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (citation omitted). "NEPA is not intended to 'generate … excellent paperwork,' but rather to 'foster excellent action' through informed decision making." *WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 53 (D.D.C. 2019) (quoting 40 C.F.R. § 1500.1(c)) (ellipsis

---

[2] While *Dep't of Transp.* cites a previous version of the NEPA regulations, it is substantially similar to the NEPA regulations in place during the June 2022 lease sale decision-making process. *Compare* 541 U.S. at 757; *with* 40 C.F.R. § 1501.5(c)(1) (2020).

in original) (citing a prior version of the NEPA regulations); *see also* 40 C.F.R. § 1500.1(a) (2020) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. … NEPA's purpose is not to generate paperwork or litigation, but to … foster excellent action.") (ellipsis added).

## II.    The Bureau's June 2022 Wyoming Oil and Gas Lease Sale

The Bureau conducted a lease sale in June 2022. In this lease sale, the Bureau auctioned 123 out of 459 nominated parcels of federal land in Wyoming for oil and gas leasing. (WY485953; WY485701). Under the MLA, the Bureau must hold oil and gas lease sales "at least quarterly" in each state where "eligible lands are available" for leasing. 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary."). This sale, in particular, was held after the Secretary missed several quarterly lease sales in Wyoming. (*See* HQ_000060) (press release by the Department of the Interior discussing the court's decision in *Louisiana v. Biden* to enjoin the Bureau from implementing the "pause"); (*see also* WY485701) ("The January 2021 decision to defer also effected these 76 parcels. For ease of review within this EA, the BLM combined the deferred 383 parcels from March 2021 with other previously deferred 76 parcels in the table below (459 total parcels)."); (ECF No. 30 at 7 n.3).

The Bureau considered and significantly reduced the number of nominated parcels it offered for auction at the June 2022 lease sale in Wyoming. Specifically, it deferred 239 whole parcels of nominated federal land from leasing. (WY485953).  The Bureau deferred portions of twenty-one parcels proximate to Greater Sage Grouse Priority Habitat and sixty-one parcels under the State Director's Discretion in response to public comment. (*Id.*). It also deferred "7 whole

parcels and a portion of 1 additional parcel for additional environmental review involving Lands with Wilderness Characteristics." (WY485953). The Bureau also analyzed a no action alternative and an alternative that would defer four whole parcels and portions of twenty-seven parcels. (WY485701, Table 2.1).

The Bureau also prepared an EA and FONSI to support its June 2022 lease sale decision. (WY485689, WY485959). The purpose and need of this sale was to respond to EOIs as required by the Federal Onshore Oil & Gas Leasing Reform Act, MLA, and FLPMA. (WY485691). To address that need, the Bureau considered a no action alternative (Alternative 1), the proposed action that would have leased 455 parcels (Alternative 2), and a modified proposed action that significantly reduced the number of parcels available for leasing (Alternative 3). (WY485959). The Bureau adopted Alternative 3, the modified proposed action. (*Id.*).

In the EA, the Bureau evaluated potential impacts across a range of environmental resources, including air quality, greenhouse gas emissions, water resources, wildlife, and socioeconomic impacts. (*See* WY485703-26) (evaluating air quality and greenhouse gas emissions); (WY485726-29) (evaluating water resources); (WY485729-61) (evaluating Greater Sage-Grouse impacts); (WY485762-85) (evaluating impacts to big game); (WY485785-86) (evaluating socioeconomic impacts). For sage-grouse, the Bureau analyzed each parcel to determine if the land at issue was located in the PHMA or GHMA. (WY485730). Lands identified as PHMA are those "having the highest value to maintaining Greater Sage-Grouse populations." (WY505893). Whereas, lands identified as GHMA are "where some special management would apply to sustain Greater Sage-Grouse populations." (*Id.*). The Bureau also ensured that the offered leases conformed to the applicable RMPs and RODs for each field office. (WY485692,

WY485966; *see also* WY485702-03) (rejecting alternatives that would violate the RMPs, including adding a no surface occupancy stipulation on all parcels offered).

In preparing the EA, the Bureau coordinated with Wyoming because of the potential impacts that oil and gas leasing may have on wildlife, natural resources, and local communities. (*See. e.g.,* WY485693). For example, the Bureau conferred with the Wyoming Game and Fish Department regarding the potential impacts on wildlife and habitat. (WY485912) (sending the preliminary parcel list to the Wyoming Game and Fish Department for an opportunity to review and send back comments); (*see also* WY485766) (the Bureau's consultation with the Wyoming Game and Fish Department led to an attached 'Special Lease Notice' on forty-four parcels that were wholly or partially within the Wyoming-designated mule deer migration corridors). To ensure protection for the Greater Sage-Grouse, the Bureau reviewed the Wyoming Game and Fish Department's database, which contains the species' most current lek location information. (WY485742). The Bureau also acknowledged Wyoming's role in monitoring potential groundwater contamination with respect to oil and gas activity. (WY485728-29).

Finally, the Bureau evaluated the socioeconomic impact of federal oil and gas leasing on Wyoming communities. As it explained, "Wyoming, as well as many counties and communities within, rely on oil and gas development as an important part of their economic base." (WY485786). "In 2016, the mining sector supported 6% of employment and 12% of labor earnings statewide[.]" (WY485785). Furthermore, federal mineral royalties, severance taxes, and ad valorem taxes comprise a majority of state and local revenue. (*Id.*).

Wyoming receives forty-eight percent of the total bids paid for parcels leased by the Bureau. 30 U.S.C. § 191(a), (b). Federal lease sale revenue supports the socially and economically impacted areas of Wyoming where federal oil and gas development occurs. *See id.* § 191(a). The

Bureau's June 2022 oil and gas lease sale in Wyoming collected over $13 million in bids. (WY486130). Accordingly, Wyoming received approximately $6 million in revenue from this sale. *See* 30 U.S.C. § 191(a), (b). Wyoming distributes this revenue to schools, local governments, infrastructure funds, and State reserve accounts. *See* Wyo. Stat. Ann. § 9-4-601. In addition to the federal revenue it receives from bids on leases, Wyoming also receives forty-eight percent of the rentals and federal royalties collected from oil and gas production. 30 U.S.C. § 191(a), (b). Wyoming also collects its own severance tax on oil and gas produced within its borders. Wyo. Stat. Ann. §§ 39-14-203(a), through -204(a).

Oil and gas activity supports the economic base of many counties in Wyoming. Wyoming counties levy an ad valorem tax on the fair market value of oil and gas production. Wyo. Stat. Ann. § 39-13-102(m). Counties distribute ad valorem taxes according to locally-established priorities, but must direct a certain portion of that revenue to local school districts. Wyo. Stat. Ann. §§ 21-13-207; 39-13-111. As the Bureau explained in the EA, lease sales lead to good socioeconomic outcomes for Wyoming communities and help support energy demands. (WY485786) ("If none of the leases were offered, and subsequently sold, the employment, revenue, and purchasing opportunities associated with developing and producing wells on these leases would be foregone, as would the opportunity to provide oil and gas resources from these lease parcels to aid in meeting the energy demands.").

## III.     Federal Regulation of Oil and Gas Operations

### A.     The Bureau uses a three-stage process to manage oil and gas leasing.

The Bureau follows a three-stage process to manage oil and gas leasing. First, the Bureau prepares a RMP, which defines the allowable uses of public lands within the planning area. *See* 43 U.S.C. § 1712; 43 C.F.R. § 1601.0-5(n). At this stage, the Bureau determines which areas are open

to leasing and under what conditions. *See* 43 U.S.C. § 1712(a); (*see also* WY485689) (Each field office reviewed the parcels to determine whether "they are located in areas open to leasing under the approved RMP" and "the appropriate stipulations required under the approved RMP"); (WY485691). These RMPs, which the Bureau tiered to here, evaluates the expected impact of potential land management decisions made in that plan, including oil and gas development. (*See, e.g.,* WY485692) (tiering to the RMP FEISs); (WY485786) (referring to the RMP FEISs for "additional discussion of potential socioeconomic impacts."). RMPs generally incorporate reasonably foreseeable development scenarios, "which projects the scope and pace of oil and gas development within the planning area." *WildEarth Guardians*, 368 F.Supp.3d at 54.

After the Bureau identifies areas open for leasing in the RMPs, anyone may submit EOIs to nominate specific parcels for inclusion in an oil and gas lease sale. BLM Manual 3120 at .3 (2013) (WY518934). After determining eligibility, the Bureau makes the nominated lands available through a competitive leasing process. *See* BLM Manual 3120 at .1(.11) (WY518931) (explaining which lands are available for competitive leasing); *see also* 43 C.F.R. § 3120.5-1; 43 C.F.R. § 3120.5-3. The Groups are challenging this stage here.

In the last stage, the Bureau evaluates site-specific proposals to develop the leases. Before any surface disturbance can occur, a lessee must submit and have approved a federal APD. 43 C.F.R. § 3162.3-1. Along with the APD, the operator must submit a drilling plan and surface use plan at least thirty days before commencing operations. *Id.* § 3162.3-1(d). The drilling plan must have "pertinent geologic data, expected hazards, and proposed mitigation measures to address such hazards." *Id.* § 3162.3-1(e). Whereas the surface use plan must "contain information specified in applicable orders or notices, including the road and drillpad location, details of pad construction,

methods for containment and disposal of waste material, plans for reclamation of the surface, and other pertinent data as the authorized officer may require." 43 C.F.R. § 3162.3-1(f).

For each APD, the Bureau determines whether to approve the lessee's proposal and what conditions to impose. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1. At this stage, the Bureau performs additional NEPA analysis. 43 C.F.R. § 3162.5-1(a). The environmental documents submitted during the APD process "will be used in determining whether or not an environmental impact statement is required and in determining any appropriate terms and conditions of approval of the submitted plan." 43 C.F.R. § 3162.5-1(a).

### B.   Multiple federal authorities protect water quality.

The federal government has enacted multiple statutes and regulations to protect natural resources. (*See* WY485693) (listing applicable statutes, federal plans, programs, and policies that the Bureau reviewed when considering its proposed action). The Bureau cited and relied on federal law in its analysis. (*See, e.g.,* WY485704) (discussing legally enforceable standards under the Clean Air Act); (WY485904) (discussing potential consultation with the Fish and Wildlife Service under the Endangered Species Act before approving "projects resulting in consumptive water use over de minimus levels, in the Platte and Colorado River Basins[.]").

For example, federal regulations require the lessee to test water quality and identify sources of groundwater. 43 C.F.R. § 3162.4-2 (providing for periodic well tests to show the quality and quantity of water.); 43 C.F.R. § 3162.5-2(d) (requiring protecting of fresh water and other usable water); 40 C.F.R. § 144.7 (EPA regulations for identifying underground sources of drinking water before conducting hydraulic fracturing); 40 C.F.R. § 144.8 (EPA's penalties for noncompliance). Onshore Oil and Gas Order No. 2 also requires lessees and operators to report all "indications of

usable water" and provides how to determine case setting depth using a variety of factors. 53 Fed. Reg. 46798, 46808 (Nov. 18, 1988).

## IV.   State Regulation of Oil and Gas Operations in Wyoming

### A.   The Wyoming Oil and Gas Conservation Commission regulates oil and gas operations in Wyoming.

The Wyoming Oil and Gas Conservation Commission regulates all oil and gas wells on federal, fee, and State trust lands in Wyoming. Wyo. Stat. Ann. § 30-5-104. Before beginning any well pad construction or drilling operations, oil and gas operators must secure a State APD from the Wyoming Oil and Gas Conservation Commission. *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 8.

The Wyoming Oil and Gas Conservation Commission also enforces rules to protect the environment. *See* Wyo. Stat. Ann. § 30-5-104(a)-(d).  For example, the Wyoming Oil and Gas Conservation Commission implements State sage-grouse protections by approving permit conditions according to the Wyoming Core Area Protection Strategy. *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 4, § 1(c)(v) ("The Commission shall, to the maximum extent possible and consistent with its statutory obligations and authorities … adopt such policies and practices as may be required in compliance with Executive Order 2010-4[.]"). The Wyoming Oil and Gas Conservation Commission also requires operators to post surety bonds that guarantee each production site is properly managed, does not damage the environment, is properly abandoned, and meets reclamation standards. *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 4(a).

Additionally, the Commission enforces well casing requirements, regulates horizontal drilling, and requires baseline groundwater monitoring on all wells. *See generally*, *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 22. State APDs require operators to meet the Wyoming Oil and Gas Conservation Commission's drilling and casing requirements for protecting groundwater,

use blowout preventers, submit information and obtain approvals before performing hydraulic fracturing, and secure approval before conducting directional drilling. *Id.* §§ 22, 23, 25, 45. The Wyoming Oil and Gas Conservation Commission prohibits oil and gas wells within 350 feet of any water supply including surface water and water wells. *Id.* § 22(b). The Wyoming Oil and Gas Conservation Commission requires surface casing "to reach a depth below all known or reasonably estimated utilizable groundwater … to protect the Use Class category and to prevent blowouts or uncontrolled flows." *Id.* § 22(a)(i). To secure a State APD, "[a]ll operators are required to submit a groundwater baseline sampling[.]" *Id.* § 46(a).

The Wyoming Oil and Gas Conservation Commission provides detailed procedures for the groundwater sampling and analysis in its Appendix K.[3] Sampling must not only be conducted on nearby water wells prior to drilling to establish a groundwater quality baseline, but the operator must conduct sampling twice after drilling and completing the oil and gas well. *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 46(a)-(e). Results of this baseline water quality sampling are provided to water well owners and posted publicly on the Wyoming Oil and Gas Conservation Commission's website.[4]

**B.     Wyoming regulates air quality, water quality, water quantity, and wildlife.**

**1.     Wyoming regulates air quality.**

In addition to the Wyoming Oil and Gas Conservation Commission, other State agencies have jurisdiction over oil and gas activities in Wyoming. Under the Clean Air Act, air pollution control at its source is the primary responsibility of states and local governments. 42 U.S.C.

---

[3]  https://wogcc.wyo.gov/rules/appendices (list of Appendices to the Wyoming Oil and Gas Conservation Commission's rules).

[4]  *See, e.g.,* http://pipeline.wyo.gov/warapi.cfm?nAPINO=929468 (water quality sampling from a well listed in the Group's report as a noncompliant well).

§ 7401(a)(3). The Wyoming Department of Environmental Quality Air Quality Division is authorized to enforce the Clean Air Act under an EPA-approved State Implementation Plan for regulating criteria pollutants. 42 U.S.C. § 7410; 40 C.F.R. § 52.2620; Wyo. Stat. Ann. § 35-11-202; *Rules, Wyo. Dep't of Env't Quality, Air Quality,* ch. 2*; (see also* WY485703). When an oil and gas operator files for a State APD, they must also secure a State air quality permit. *See* Wyo. Stat. Ann. § 35-11-801; *Rules, Wyo. Dep't of Env't Quality, Air Quality*, ch. 6; *see also Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 4, § 1.

### 2.     Wyoming regulates water quality and water quantity.

The Wyoming Department of Environmental Quality Water Quality Division has the delegated authority to issue and enforce federal National Pollutant Discharge Elimination System permits, Section 401 certifications, and shares regulatory jurisdiction with the Wyoming Oil and Gas Conservation Commission over the disposal of oil field waste materials and spills. *See Rules, Wyo. Dep't of Env't Quality, Water Quality*, ch. 2, §§ 4-6. Similarly, the State Engineer's Office issues water well permits and authorizes the appropriation of water used for industrial purposes. *See* Wyo. Stat. Ann. § 41-3-938.

### 3.     Wyoming regulates wildlife.

The State of Wyoming exercises sovereign authority over wildlife in Wyoming. *O'Brien v. State*, 711 P.2d 1144, 1148-49 (Wyo. 1986) (explaining that "the wildlife within the borders of a state are owned by the state in its sovereign capacity" and the state has "the power and duty to protect, preserve and nurture the wild game"). In Wyoming, wildlife are the property of the State. Wyo. Stat. Ann. § 23-1-103. The Wyoming Legislature has enacted a comprehensive statutory scheme to provide for the state management of Wyoming's wildlife. *Id.* For example, the Wyoming Game and Fish Department manages big game species and the sage-grouse as an "upland game bird." *See, e.g.,* Wyo. Stat. Ann. § 23-1-101(a)(i) (defining big game species); *Rules*

11

*Wyo. Game & Fish Comm'n*, ch. 11, § 3. "The WGFD [Wyoming Game and Fish Department] revises its population objectives for each big game species based on new habitat information, population trends, recreation demand, and public input." (WY485762). It is the Wyoming Game and Fish Department's population objectives that help determine the health of big game populations. (*Id.*).

For the Greater Sage-Grouse, the Bureau has acknowledged Wyoming's efforts to protect the bird. (WY485730) (discussing Wyoming's Core Area Protection strategy for Greater Sage Grouse). Wyoming's Core Area Strategy, adopted through a series of executive orders, prioritizes management of geographic areas containing core sage grouse habitat. (*Id.*). The Bureau has incorporated the Wyoming Core Area Strategy into the EA. (WY485730). In fact, the Bureau made the decision not to lease certain federal parcels in June 2022 based on existing conservation strategies for the Greater Sage Grouse. (WY485953).

The Wyoming Core Area Protection Strategy is frequently updated. (WY485730 n.12). Following a review by the United States Fish and Wildlife Service, Wyoming updated its Core Area Strategy in 2011 with Executive Order 2011-5. (*See* WY485730 n.12); *see also* Wyo. Exec. Order No. 2011-5, *Greater Sage-Grouse Core Area Protection*, (June 2, 2011). Afterwards, Wyoming Governor Matt Mead issued updated management recommendations for the sage grouse with Executive Order 2015-4 based on emerging science and data. Wyo. Exec. Order No. 2015-4, *Greater Sage-Grouse Core Area Protection*, (July 29, 2015). Wyoming also recently updated its recommendations again with Executive Order 2019-3. (WY485730).

Wyoming implements the Core Area Strategy through State permitting processes. (WY485730). When a federal permit is required, proponents first contact the federal agency, which then determines the appropriate process for completing the Density Disturbance Calculation Tool

and receiving recommendations from the Wyoming Game and Fish Department. *See, e.g., Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 8 (requiring a state APD before beginning operations); (WY485874) (stipulation requiring Density Disturbance Calculation Tool); *Rules, Off. of Land & Invs., Bd. of Land Comm'rs,* ch. 29 § 7(a) (using the Density Disturbance Calculation Tool to determine eligibility for mitigation credits). Any proposed activities are analyzed before permits are issued to ensure consistency with the Wyoming Core Area Strategy. (WY485761).

## STANDARD OF REVIEW

Under the APA, courts set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706 (2)(A). An action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (alteration added). The reviewing court must ensure that the agency articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). "In reviewing NEPA challenges, we must 'be mindful that our role is not to "flyspeck" an agency's environmental analysis, looking for any deficiency no matter how minor." *Indian River Cnty., Fla. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) (citations omitted). "Rather, it is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Id.*

## ARGUMENT

The Bureau's NEPA analysis for the lease sale adequately identified and evaluated adverse environmental effects of the proposed action. *See Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 349-50 (1989). First, the Bureau reasonably conformed the lease sale to the local RMPs and ensured consistency within Wyoming. Since the decision to be made was to make parcels available to lease according to the approved RMPs, the Bureau's alternatives were reasonable. (*See* WY485691) (decision to be made); (*see also* WY485701-03) (the three alternatives the Bureau considered). Any comparison to another State's lease sale is not persuasive because each State has different State and local field offices and land-use planning documents.

Second, the Bureau adequately took a hard look at environmental impacts. The Bureau considered existing federal and state regulations to mitigate potential environmental impacts. Due to the comprehensive nature of state and federal regulation, the Bureau was not arbitrary and capricious in considering these regulations as adequate to protect environmental resources. *See, e.g.,* 82 Fed. Reg. 61924, 61927 (Dec. 29, 2017) (the Bureau acknowledged that existing regulations ensured that oil and gas operations are conducted in an "environmentally responsible manner[.]"). The Bureau also was not arbitrary and capricious in deferring site-specific analysis to the APD stage, when the Bureau will have more site-specific information. (*See, e.g.,* WY485698). Lastly, the Bureau properly considered the evidence on the record and chose between conflicting experts when necessary. (*See, e.g.,* WY485727-28) (discussing evidence before the agency about the impacts drilling has on groundwater).

## I.      The Bureau's June 2022 Lease Sale was Consistent with the Applicable RMPs

In their Motion for Summary Judgement, the Groups claim the Bureau failed to consider a reasonable range of alternatives and acted arbitrarily and capriciously by not analyzing or conducting a lease sale with a small number of parcels. (ECF No. 27-2 at 32-40). To support this claim, the Groups point to lease sales done in seven other States. (*Id.* at 33). However, the Groups equating Wyoming's lease sale with other States is a false comparison. Every federal lease sale in

each State concerns uniquely different field offices, RMPs, and RODs. (*See, e.g.,* WY485692). However, the Groups narrowly focus on the number of parcels while ignoring the rest of the information that the Bureau evaluated in the administrative record. (ECF No. 27-2 at 3-4).

The Bureau's alternatives were reasonably tailored in the EA. "The selection of alternatives must be reasonable, as defined in relation to the objectives of a particular action that the agency sets out." *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F.Supp.2d 151, 161 (D.D.C. 2010). The applicable decision was "whether to make parcels available for lease and what stipulations will be placed on those parcels, in conformance with the approved RMPs." (WY485691). In addressing this decision, the EA considered three alternatives. (WY485701-03). The Modified Proposed Action (Alternative 3) deferred 260 parcels, more than the number of parcels offered for sale. (WY485702). The Bureau deferred these parcels because they were in the PHMA and to allow for any decision changes in the sage-grouse RMP amendment, a decision grounded in the RMPs. (WY485702). Thus, the alternatives evaluated were reasonable in relation to the agency's objectives in the lease sale.  *See Theodore Roosevelt Conservation P'ship*, 744 F.Supp.2d at 161. In contrast, the Groups take the position that the Bureau should have arbitrarily picked a number that was smaller without aligning the deferral of nominated parcels to the RMP. (*See* ECF No. 27-2 at 34); (*see also* WY485702) (rejecting an alternative of attaching a no surface occupancy stipulation to all available parcels because "it is not in conformance with the approved RMPs").

Further, the Bureau provided a reason why more parcels were included in the Wyoming sale. (WY486078) ("The number of EOIs the WSO receives is large compared to the number of EOIs other states may receive. … For this sale, the BLM WSO analyzed parcels that were previously identified for the postponed March and June 2021 sales. … The combination of these

two sales created the large number of parcels to analyze, scope, and provide the public an opportunity to comment."). The Groups argue that "the oil and gas industry does not determine the alternatives BLM must consider." (ECF No. 27-2 at 36). This argument is inconsistent with the record, which clearly shows that industry did not determine the alternatives the Bureau considered. (*See* WY485701-03) (contrary to the Group's argument the Bureau expressly rejected an alternative that leased all parcels nominated.). Instead, the Bureau analyzed a no action alternative, an alternative that would defer several parcels, and an alternative that would offer a little over a quarter of the nominated parcels (260 of those deferrals being PHMA parcels). (WY485701-02) (459 parcels were nominated and the chosen alternative in the EA offered only 129 parcels).

Even if the Bureau treated Wyoming differently, it was not arbitrary and capricious. The Bureau properly used the local RMPs to select nominated parcels available for leasing and the corresponding required stipulations. (WY485691). Furthermore, the Bureau's own Instruction Memorandum only requires consistency within the State:

> The state/field offices will continue to determine appropriate stipulations for parcels offered for lease, consistent with the applicable RMP. Each state/field office has the discretion to form Interdisciplinary Consistency Review Teams (IDCR Team) for lands under its jurisdiction. The primary purposes of IDCR Teams are to prepare lease stipulations that are written in a BLM approved format and area consistent **within each state** for the protection of similar resources or resource settings, and with the goal to edge-match across administrative boundaries[.]

(HQ_000056) (emphasis added). The Bureau consistently used the RMPs to determine which parcels to lease and which stipulations to use, so it did not act arbitrarily and capriciously when it offered more leases than in other States.

The Groups make a false comparison with Colorado to assert that the Bureau acted arbitrarily. (*See* ECF No. 27-2 at 36-37). First of all, the 119 parcels nominated in Colorado is less than a fourth of the nominated parcels in Wyoming. (*See* HQ_000088; *see also* WY485701). Even

if there was a closer comparison, the States are completely different. The States have different field offices and land-use planning documents. Additionally, the status of each State's natural resources are different. The simple fact that the Bureau conducted a lease sale in both States does not lend itself to a reasonable comparison.

An example is air quality, particularly ozone. As the Groups have pointed out in their own comments to the Bureau, EPA has recently proposed downgrading Colorado's Denver/Front Range Ozone Nonattainment Area from "serious" to "severe" due to continued ozone NAAQS violations. (WY485599).  Whereas, Wyoming has determined that the planning areas are currently in compliance with both State and Federal ambient air quality standards for all criteria pollutants. (WY485704). The exception is the Upper Green River Basin, which is a designated nonattainment area for the 2008 ozone standard. (*Id.*). However, the Upper Green River Basin is attaining the ozone standard as of July 2015 and no re-designation has occurred. (WY485710). Furthermore, only eighteen of the parcels from the sale are located in this area. (*Id.*). Wyoming's air quality and its ozone nonattainment designation was specifically addressed in the Bureau's analysis. (*See* WY485704-WY485710).

## II.     The Bureau Took a Hard Look at Environmental Impacts

The Bureau took the required hard look at the impacts of its lease sale on groundwater, wildlife, and climate. The Groups argue that the EA did not take a "hard look" at the impacts by relying on compliance with regulations, waiting to do site-specific analysis at the APD stage, and ignoring evidence before the agency. (*See generally*, ECF-27-2). They also challenge the justification of the lease sale's benefits, apparent conflicts with climate policy, and the Bureau's issuance of a FONSI. (*See id.* at 40-45). The record belies these claims.

"[I]nherent in NEPA and its implementing regulations is a 'rule of reason[.]'" *Dep't of Transp.*, 541 U.S. at 754 (citation omitted) (alterations added). "The purpose and function of

NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. … NEPA's purpose is not to generate paperwork or litigation, but to … foster excellent action." 40 C.F.R. § 1500.1(a) (2020) (ellipses added). The D.C. Circuit has employed a four-part test to analyze an agency's finding of no significant impact. *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983). Under this test, the Court considers:

> (1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Id*.

Here, the Bureau considered the available science and the regulatory scheme, adequately responded to public comments, and properly evaluated impacts in its analysis. First, the Bureau relied on federal and state regulations to mitigate environmental impacts. (*See, e.g.,* WY485728) ("Any proposed drilling/completion activities would have to comply with Onshore Order #2, 43 CFR § 3160 regulations, and not result in a violation of a Federal and/or State law. If these conditions were not met, the proposal would be denied."). Second, the Bureau adequately analyzed the effects of the lease sale and deferred site-specific impacts to the APD stage. Third, the Bureau properly considered the evidence in the record and where appropriate chose between conflicting experts. Therefore, the Bureau met its obligations under NEPA by explaining how groundwater and wildlife will be impacted by the lease sale decision and calculating climate impacts. *See Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1173 (10th Cir. 2007) (finding that the agency acknowledged in detail the adverse impacts of the project and "NEPA does not require more").

18

### A. The Bureau was not arbitrary and capricious in relying on federal and state regulations to analyze climate impacts.

The laws, rules, and regulations that regulate oil and gas operations in Wyoming are more comprehensive than the Groups state. (*See* ECF No. 27-2 at 6-7, 18-22). At the State level, an oil and gas operator must not only acquire a State APD but they must secure necessary air and water permits before commencing operations. *See Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 8; *see also* Wyo. Stat. Ann. § 35-11-801; *Rules, Wyo. Dep't of Env't Quality, Air Quality*, ch. 6; *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 4, § 1; *See Rules, Wyo. Dep't of Env't Quality, Water Quality*, ch. 2, §§ 4-6. Federal APDs also require an operator to submit a drilling plan and a surface use plan. 43 C.F.R. § 3162.3-1(d). Since both State and federal regulations require an operator to anticipate environmental consequences and the necessary permits, current regulations provide more than adequate enforcement and protection of environmental resources.

### 1. Wyoming has extensive regulatory mechanisms to protect groundwater.

The Groups barely acknowledge the existing regulatory mechanisms Wyoming enforces on both federal and non-federal lands. In particular, the Groups contend that the Bureau's Onshore Orders and wildlife stipulations do not adequately protect groundwater, air quality, and wildlife. (ECF No. 27-2 at 6-8). They also contend that the existing federal regulation is not protective enough and the Bureau was arbitrary and capricious in relying on State law. (ECF No. 27-2 at 20-21). But the Groups ignore Wyoming's comprehensive role in regulating oil and gas activity. *See generally*, *Rules, Wyo. Oil & Gas Conservation Comm'n,* chs. 3 and 4; Wyo. Stat. Ann. § 35-11-801; *Rules, Wyo. Dep't of Env't Quality, Air Quality*, ch. 6; *Rules, Wyo. Dep't of Env't Quality, Water Quality*, ch. 2, §§ 4-6. A role that the Bureau itself recognized and relied on in mitigating environmental impacts. (*See, e.g.,* WY485728) (discussion of State regulation of hydraulic fracturing); (WY485729) (discussion of the State's regulation of groundwater and the State's

requirement of a Stormwater Pollution Prevention Plan before any surface disturbance over one acre in size can occur); (WY485729-30) (discussing Wyoming's conservation strategies for sage-grouse including Wyoming's Core Area Protection Strategy for Greater Sage-Grouse).

Wyoming possesses police power to regulate its natural resources. *See, e.g., Wall v. Midland Carbon Co.*, 254 U.S. 300, 313-16 (1920) (upholding the State's police power to regulate natural gas). Wyoming exercises this authority by regulating oil and gas activity on fee, State, and federal land in Wyoming. *Big Piney Oil & Gas Co. v. Wyo. Oil & Gas Conservation Comm'n*, 715 P.2d 557, 563 (Wyo. 1986); *see also* Wyo. Stat. Ann. § 30-5-104(a) (stating that the Wyoming Oil and Gas Conservation Commission "has jurisdiction and authority over all persons and property, public and private," related to oil and gas development). The Wyoming Oil and Gas Conservation Commission oversees drilling, production activities, well spacing, and enforces provisions to prevent the contamination of underground water. Wyo. Stat. Ann. § 30-5-104(d)(ii). To meet its statutory obligations, the Wyoming Oil and Gas Conservation Commission enacted regulations and enforces standards for drilling, producing, surface use, and groundwater protection. *Id.* at (d)(v)(vi).

Not only is there substantial State protections for groundwater, but there are federal protections as well. For identifying groundwater, there are multiple federal regulations relating to the testing and identification of sources of water to protect. 43 C.F.R. § 3162.4-2 (providing for periodic well tests to show the quality and quantity of water. And during the drilling of the well, when required, must conduct reasonably necessary tests and surveys to find the presence and quality of water); 43 C.F.R. § 3162.5-2(d) (requiring protection of fresh water and other usable water); 40 C.F.R. § 144.7 (EPA regulations for identifying underground sources of drinking water before conducting hydraulic fracturing); 40 C.F.R. § 144.8 (EPA's penalties for noncompliance).

Therefore, the Groups are incorrect in their statement that "neither Onshore Order No. 2 nor other regulations require companies to test and identify all potentially usable water zones before drilling." (ECF No. 27-2 at 9).

Despite all of the federal and state regulation that exists to protect usable water, the Groups claim that the 2015 Rule was necessary to fill a regulatory gap. (*See* ECF No. 27-2 at 7). On the contrary, the Bureau reversed the 2015 rule because the Rule was duplicative of state requirements and unnecessary. *See* 82 Fed. Reg. at 61925, 61932. In reversing the 2015 Rule, the Bureau acknowledged that "existing regulations … ensure that operators conduct oil and gas exploration and development in a safe and environmentally responsible manner that protects other resources." 82 Fed. Reg. at 61927 (ellipsis added); *see also id.* at 61935 ("Particularly where, as here, there is no compelling indication that modern state regulations are allowing unnecessary or undue degradation to the public lands, the Secretary is within his discretion to decide that rescinding the 2015 rule would reduce the burdens both on operators and the BLM, with little reduction in the protection of those lands."). Therefore, the Groups' claim that the Bureau's reversal of the 2015 Rule "reopen[ed] the gap in federal regulation" is wrong. (*See* ECF 27-2 at 7).

### B.   The Bureau was not arbitrary and capricious in deferring site-specific analysis to the APD stage.

The Groups argue that the Bureau was arbitrary and capricious by deferring site-specific analysis. (*See* ECF 27-2 at 24, 27-28, 30). However, the Bureau was not arbitrary and capricious in withholding site-specific NEPA analysis until the APD stage. In fact, NEPA regulations recommended that agencies tier their "environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review." 40 C.F.R. § 1501.11(a) (2020). The Bureau has adequately explained in its Cross-Motion for

Summary Judgement and in the EA why it was appropriate to defer site-specific analysis to the APD stage and Wyoming incorporates this analysis by reference. (*See* ECF No. 30 at 9-10, 17-20, 24-25, 26 n.11; 30-32); (*see also* WY485692; WY485698). Once the Bureau has the site-specific information and the operator's plans, the Bureau can better evaluate the risks.

Until the Bureau has site-specific proposals, any site-specific impacts would be speculative. Before commencing operations, an operator must proceed with the State and Federal government APD process along with any surface occupancy agreements needed with the appropriate agency or surface owner. These procedural protections guard against surface disturbance before the APD stage and inform any additional environmental analysis. Therefore, the Bureau's general analysis of potential impacts to the environment is appropriate at this stage in the lease sale process. (*See* ECF No. 30 at 9-10).

### C.       The Bureau considered the available science.

The Groups argue that the Bureau failed to take a "hard look" at impacts to groundwater and wildlife. (*See, e.g.,* ECF No. 27-2 at 17-19, 24). Specifically, the Groups argue that the Bureau failed to consider substantial evidence in the record that was contrary to the Bureau's decision. (*See, e.g., id.* at 18-21, 28-29). However, the Bureau took a "hard look" at environmental impacts by relying on substantial evidence and deciding between experts when appropriate.

### 1.       The evidence used by the agency satisfies the hard look requirement.

A full EIS is not required if the Bureau finds that the action will only cause insignificant impacts. *See* 40 C.F.R. § 1501.3(a)(2) (2020) (allowing an agency to decline to prepare an EIS if there are no significant environmental impacts). An EA must only "briefly discuss … the environmental impacts of the proposed action and alternatives[.]" 40 C.F.R. § 1501.5(c)(2) (2020). "Thus, unless BLM's decision that impacts would be 'minimal' was itself arbitrary and capricious,

no further analysis was required regardless of the Aquifer's value as a freshwater resource." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 713 (10th Cir. 2009). As the D.C. Circuit has held, the court's role is "to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006) (citation omitted).

The Bureau's incorporation of, and reference to, the latest studies in the EA satisfies the hard look requirement under NEPA. *See, e.g., Native Ecosystems Council v. Erickson*, 330 F.Supp.3d 1218, 1242-43 (D. Mont. 2018) (recognizing that the agency took a hard look at big game impacts by considering recommendations from local wildlife biologists); *Utah Env't Cong. v. Russell*, 518 F.3d 817, 831 (10th Cir. 2008) (upholding an agency's conclusion that a project would have no significant impacts because the agency provided some evidence to support it). For instance, the Bureau cited a recent study on the Pinedale Anticline that "did not find a direct link to known detections of petroleum hydrocarbons to the hydraulic fracturing process[,]" along with groundwater contamination investigations conducted at the Pavillion gas field.  (WY485727); *cf. Richardson*, 565 F.3d at 715 (the agency was able to point no record evidence for its conclusion and the evidence supported the petitioner's view: "The record is silent regarding the source of BLM's determination[.]"). The Bureau also considered studies from the Wyoming Department of Environmental Quality in 2016 and 2019 that addressed the lack of impacts demonstrated from hydraulic fracturing. (WY485727); (*see also* WY562422-522) (the 2016 study); WY509130 (the 2019 study); (ECF No. 30 at 12-13) (an in-depth explanation of the two reports and their conclusions). In light of the results from the Wyoming-specific studies and existing State and Federal regulation, the Bureau was not arbitrary and capricious in not finding significant impacts to groundwater.

23

The Bureau's incorporation of impacts from RMPs and other planning documents like Wyoming's Core Area Protection Strategy for Greater Sage-Grouse was not arbitrary and capricious.[5] The RMPs provide a detailed analysis of existing conservation efforts to offset impacts, the sage-grouse habitat impacted by the area open to leasing, reasonably foreseeable future actions, among other variables. (*See, e.g.,* WY504383-WY504441) (section of Bighorn Basin Proposed RMP's Final EIS discussing impacts to sage-grouse). The Bureau also cited to the Wyoming Game and Fish Department's Job Completion Reports, which contain detailed and current population data for the species. (WY485761). After categorizing which habitat management area the parcels are in (GHMA or PHMA) and using Wyoming Game and Fish Department data for where leks are located, the Bureau placed Standard Lease Notice 3 on all parcels and attached Timing Limitation Stipulations, Controlled Surface Use, or No Surface Occupancy to parcels as appropriate. (WY485761).

The Bureau analyzed impacts on wildlife. Like the sage-grouse, the Bureau cited to the Wyoming Game and Fish Department's Job Completion Reports and other information compiled by the Wyoming Game and Fish Department. (WY485762) (mule deer and pronghorn); (*see also* WY485766) (three formally designated wildlife corridors within Wyoming based on the Wyoming Game and Fish Department's collected mule deer movement data and the Wyoming Game and Fish Department's collaboration with stakeholders and agency personnel). In addition to explaining the primary threats of development and incorporating analysis from the RMPs, the Bureau provided the acreage of leases that would be in mule deer and pronghorn crucial winter

---

[5] Wyoming incorporates by reference the Bureau's explanation of the EISs and reasonable development scenarios the Bureau tiered to in its analysis. (*See* ECF No. 30 at 10-11, 14-15); (*see also* ECF No. 30 at 22) (explaining use of 2015 Sage Grouse Plan Amendments and the relevant EISs); (ECF No. 30 at 27 at 26-27).

range. *Compare* WY485764-65; WY485783; *with Powder River Basin Res. Council v. BLM*, 37 F. Supp. 3d 59, 73 (D.D.C. 2014) (finding that the EA "explicitly considered the impacts of [ ] development on the elk herd's southern range in the cumulative impacts analysis. … BLM compared the amount of available elk security habitat in the Planning Area, … [t]hat comparison revealed … 63% of the elk's security habitat within the herd's southern range would be lost") (alterations added). The Bureau was not arbitrary and capricious by doing this level of analysis at the leasing stage.

An agency is not arbitrary and capricious if it chooses a reasonable method to evaluate the significance of impacts on a resource. *See Powder River Basin Res. Council*, 37 F.Supp.3d at 74. It is unclear what reasonably foreseeable impacts the Groups wanted to see at this stage of leasing. (*See* ECF 27-2 at 31) (requesting estimate of impacts to resources other than climate and referencing the Bureau's projection of future emissions). Even so, the Bureau may choose its method to determine significance. The Bureau chose to use the RMPs and reasonable development scenarios in addition to how much acreage the option would take in critical areas like crucial winter range. This way of evaluating impacts gives the Bureau enough information to make an informed decision – the purpose of NEPA. *See Powder River Basin Res. Council*, 37 F.Supp.3d at 74-75 (holding that "BLM's decision to measure impacts to the southern range using loss of security habitat was reasonable, because that is the type of habitat 'necessary for maintaining this herd'").

The Groups' arguments regarding the significance climate impacts, the necessity of a cost-benefit analysis, and the application of various broad policies are similarly unavailing. As stated previously, NEPA requirements are procedural and do not "mandate particular results[.]" *Dep't of Transp.*, 541 U.S. at 756 (citation omitted) (alteration added); *see also Sierra Club*, 827 F.3d at 68 (explaining that, "[a]s a procedural statute, NEPA does not mandate any particular outcome")

(alteration added). NEPA does not "require agencies to elevate environmental concerns over other appropriate considerations[.]" *WildEarth Guardians*, 738 F.3d at 303 (internal quotation marks and citation omitted) (alteration added). Here, the Bureau provided the context and severity of potential climate impacts, along with methods of mitigating impacts. (WY485713-26). In the EA, the Bureau provided reasonable estimates of the amount of greenhouse gas emissions that each alternative would contribute and compared those emissions to other sources to provide a reference. (WY485717-21). The Bureau also provided the social cost of these greenhouse gases for each alternative. (WY485724-26).

Contrary to the Group's challenge, the Bureau considered climate impacts, and nothing more was needed. (*See* ECF 27-2 at 40-42, 44-45); (*see also* ECF No. 30 at 43-45) (explaining why a FONSI was appropriate "because BLM 'identified the relevant environmental concern[.]'"). Wyoming also incorporates by reference the Bureau's analysis regarding the cost-benefit analysis and policy directives. (*See* ECF 30 at 38-43). The analysis provided by the agency provided enough information to keep the public informed and to provide the "hard look" NEPA requires.

## 2. The Bureau properly weighed the facts in the record.

The facts that the Groups selectively cite from the record do not support their overall conclusion. For example, the Groups cite a 2016 national report done by EPA to discuss the hazards of improper casing and contend that the Bureau "'failed to consider an important aspect of the problem.'" (*See* ECF No. 27-2 at 5, 18-19) (citation omitted). However, the section the Groups cite is about proper wellbore construction and surface casing related to hydraulic fracturing and not drilling in general. (*See* WY483251-53, WY483536). Not only is the report not specific to Wyoming, but also the report only concerns a specific use of the land that may not occur. As the Bureau itself stated, "[w]ithout a discrete development proposal, the use of hydraulic fracturing in the oil and gas development process cannot be predicted." (WY485727).

Furthermore, the Groups state that, "EPA has cautioned that 'if the surface casing is not set deeper than the bottom of the drinking water resource, the risk of aquifer contamination increases a thousand-fold.'" (*See* ECF No. 27-2 at 5) (citing WY483536). However, before the section the Groups quote, the beginning of the sentence says "Risk evaluation studies of a **limited** number of injection wells shows that …" (WY483536) (emphasis added). Due to the report being national in scope, there is no indication that these injection wells were in Wyoming, which has its own state laws and protections. (*Id.*).

Instead, the Bureau provided a general discussion of issues associated with hydraulic fracturing and incorporated its Hydraulic Fracturing White Paper in its entirety. (WY485727). This report was prepared by BLM's Wyoming State Office and discusses hydraulic fracturing, potential impacts on water resources, and spill prevention and response. (*See* WY485726); (*see also* WY485902-24); (ECF No. 30 at 11-12) (explaining conditions that make groundwater aquifers more vulnerable to oil and gas development and how existing regulations adequately constrain those impacts). This report also stated that even if impacts to usable waters were to occur, "a greater number of people could be affected in densely populated areas versus sparsely populated areas characteristic of WY [Wyoming]." (WY485906).

The Groups also misleadingly state that the Bureau ignored "substantial evidence" in the EA and "'failed to consider an important aspect of the problem.'" (*See* ECF No. 27-2 at 18-19) (citation omitted). For instance, the Groups cite oil and gas trade associations' comments on the 2015 Rule as evidence of surface casing not always extending below drinking water. (*See* ECF No. 27-2 at 18-19). Instead, the comments cited by the Groups from oil and gas trade associations only say that the 2015 Rule changed the existing practice by requiring operators "to identify the location of usable water to be protected based on a quantitative TDS calculation." (WY483902).

These comments address that state oil and gas agencies and Bureau field offices have protected usable water for decades by informing operators about the location of usable water and designating depths for well casing. (*Id.*). The operators also pointed out "the difficulty and expense of measuring the numerical quality of water … [since] [n]o logging tool directly measures TDS." (*Id.*). "Operators often run resistivity logs for intermediate and production casing, and these logs might allow the qualitative identification of high-salt-content zones. These logs do not, however, directly measure TDS, and there are too many variables for the signature these logs record to be converted into accurate TDS data." (*Id.*). Thus, the oil and gas operators did not even come close to saying that casing does not always extend below usable water; instead they were raising objections to the 2015 Rule requiring a quantitative TDS calculation.[6]

Even if the Groups' evidence was persuasive, the agency properly considered the information before it. (*See* WY485727-28) (discussing evidence before the agency about the impacts drilling has on groundwater). Part of the agency's analysis included a study from the Wyoming Department of Environmental Quality that reviewed over 11,700 analytical results and showed that it was "unlikely that hydraulic fracturing has caused any impacts to the water-supply wells." WY485727; WY508090-93 (fact-sheet discussing the study). In comparison, the Groups submitted a report that assumed groundwater impacts by identifying sixty-two wells and found thirty-six with intermediate casing based on numbers from the Wyoming Oil and Gas Conservation Commission's database.[7] (WY483877, WY483891-93). Wyoming also incorporates by reference

---

[6] The comment cited by the Groups also mentioned the 2015 Rule would set casing below aquifers that have been determined by state laws to not be economically viable. (WY483904).

[7] The report also assumes groundwater impacts without discussing intermediate casing, which the Wyoming Oil and Gas Conservation Commission states intermediate casing is used on the majority of horizontal wells. https://wogcc.wyo.gov/public-resources/oil-gas-resources (link to multiple resources from the Wyoming Oil and Gas Conservation Commission including a "Drilling and

the Bureau's discussion of the "hardly definitive" and outdated information presented by the Pavillion oil and gas field research. (ECF No. 30 at 14).

The Groups cite the case *WildEarth Guardians* to support their concerns regarding risks to groundwater from development. (ECF No. 27-2 at 4) (citing *WildEarth Guardians v. BLM*, 457 F.Supp.3d 880, 885-86 (2020)). Wyoming objects to the Groups attempting to use a case as a short cut to establish evidence of harms to groundwater in a case concerning Wyoming. *See id.* The Groups cannot use this case to establish that well construction issues and hydraulic fracturing present the greatest risks to groundwater because *WildEarth Guardians* concerned a lease sale in Montana and a different administrative record. *WildEarth Guardians*, 457 F.Supp.3d at 885. Regardless, the district court's role is to decide whether the evidence in the administrative record permitted the agency to make the challenged decision. *See Citizens for Resp. & Ethics in Washington v. SEC*, 916 F.Supp.2d 141, 145 (D.D.C. 2013) ("'[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'") (citation omitted).

Therefore, the Bureau relying on the study provided by the Wyoming Department of Environmental Quality was appropriate and not just based on an assumption of effective enforcement.[8] *See Gulf Restoration Network*, 47 F.4th at 803; *see also Richardson*, 565 F.3d at

_____

Completions Overview"). Therefore, merely subtracting two numbers to find the uncemented interval does not prove that any violation occurred.

[8] Regardless, the Group's report was prepared in a rush before the sale and is not comparable to the contrary evidence referenced in *Gulf Restoration Network*. (*See* WY483881) (report referenced by the Groups analyzing the June 2022 lease sale mentioning shortcuts done due to "time constraints"); *see also* 47 F.4th at 803 (report from the Government Accountability Office criticizing "'outdated policies and procedures' and failing to develop 'criteria to guide how it uses enforcement tools.' [ ]It further found that this lack of criteria 'causes BSEE to act inconsistently,' creates uncertainty about BSEE's 'oversight approach and expectations,' and risks 'undermining [agency] effectiveness.'"). Wyoming incorporates by reference the Bureau's in-depth explanation

715 (explaining that "[b]ecause evidence in the record indicated that impacts on waterfowl were a possibility, and **no evidence** pointed to the opposite conclusion, it was impossible to say that the agency had sufficiently examined the evidence before reaching its determination") (alteration and emphasis added). Unlike the agency in *Gulf Restoration Network* that "offered unelaborated statements that BSEE's enforcement was 'rigorous,'" the Bureau cited studies showing the potential for negative groundwater impacts in Wyoming are unlikely. *Gulf Restoration Network*, 47 F.4th at 803; (WY485727; WY486055) (citing two Wyoming reports concluding that it is "unlikely that hydraulic fracturing has caused any impacts to the water-supply wells"). Because the agency's decision can be "ascribed to a difference in view or the product of agency expertise[,]" the Groups' claims must fail. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43 (alteration added).

Furthermore, the Groups' report does not show "that hydraulic fracturing approved by BLM has systematically contaminated groundwater or that offering these parcels for lease will significantly impact water resources." (WY486055). As the Bureau points out there is no indication that a legal violation occurred or that the wells are "threatening usable water." (*See* ECF No. 30 at 16). As the D.C. Court of Appeals said in *Gulf Restoration Network*, the question is "whether the agency had any 'reasonable basis' to conclude that the rule 'was being *adequately* enforced.'" 47 F.4th at 804 (citation omitted) (emphasis in original). The Bureau's citation of studies showing that hydraulic fracturing are not harming groundwater gives the agency a reasonable basis to conclude that Wyoming adequately enforces casing requirements and provided more than a post hoc rationalization. *See id.*

---

differentiating between the facts in *Gulf Restoration Network* and the instant case. (*See* ECF No. 30 at 15-16).

The Bureau also took a hard look at the impacts to big game animals. In criticizing the Bureau's consideration of impacts to big game, the Groups selectively cite the EA without giving proper context. (ECF No. 27-2 at 25-26, 29). While, the Groups focus only on oil and gas impacts, there are multiple causes of herd declines discussed in the EA. First, the EA discusses that herd units in the Wind River/Bighorn Basin District that are below population objectives have periodic disease outbreaks and "have been subject to periods of drought". (WY485762). In the Pinedale Anticline area that the Groups focus on, the EA attributed the majority of the die-off to harsh winter conditions – the herd "was negatively **affected by harsh winter conditions** and subsequent die off along with 100% fawn mortality in isolated areas[.]" (WY4857562) (emphasis added). The Groups also fail to discuss that crucial winter range timing limitations were initially authorized in 2005 by the Pinedale Anticline ROD, making future development less likely to impact crucial winter range. (*Id.*). The Bureau also acknowledged recent data concerning oil and gas impacts on big game, but the Pinedale field office has not yet recommended any changes and is continuing to study and coordinate with Wyoming Game and Fish Department and other local partners. (*Id.*). This analysis fulfilled the purpose of NEPA. 40 C.F.R. § 1500.1(a) (2020) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process.").

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the Federal and State Defendants and deny the Groups' motion for summary judgment on all claims.

Dated this 22nd day of May, 2023.

/s/ *Shannon Leininger*
Shannon Leininger, WSB #8-6932
Assistant Attorney General
Travis Jordan, WSB # 7-5721
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
shannon.leininger@wyo.gov
travis.jordan@wyo.gov

*Attorneys for Intervenor-Defendant State of Wyoming*

**CERTIFICATE OF SERVICE**

I certify that on this 22nd day of May, 2023, I electronically filed the foregoing with the Clerk of the U.S. District Court for the District of Columbia and served all parties using the CM/ECF system.

/s/ *Shannon Leininger*
Shannon Leininger
