IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEBRA HAALAND, in her official capacity as Secretary of the Interior, *et al.*, <br><br> Defendants, <br><br> and <br><br> STATE OF WYOMING, <br><br> Intervenor-Defendant. | Case No. 1:22-cv-01871-CRC |

**FEDERAL DEFENDANTS' RESPONSE BRIEF REGARDING REMEDY**

**INTRODUCTION**

Federal Defendants request that the U.S. Bureau of Land Management's ("BLM") June 2022 Wyoming leasing decision be remanded without vacatur and that the leases resulting from the sale likewise not be vacated. Although the Court found multiple National Environmental Policy Act ("NEPA") violations, it also recognized that BLM may be able to justify its decision on remand. Further, vacating the leasing decision where the lease sale may be held again would be far more disruptive than allowing the leasing decision to stay in place during the remand. The Court can instead follow the example set by multiple courts in the oil and gas leasing context by imposing narrowly tailored injunctive relief to avoid any potential harm to the environment pending the remand.

**ARGUMENT**

**I.    Vacatur is Not Warranted Based on the Seriousness of the Legal Errors**

The errors identified in BLM's NEPA analysis are not so serious as to warrant vacatur. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). The seriousness of the agency's errors "is determined at least in part by whether there is a significant possibility that the [agency] may find an adequate explanation for its actions on remand." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation and internal quotation marks omitted). That "significant possibility" exists here, and Plaintiffs' arguments to the contrary are not persuasive.

Plaintiffs' arguments concerning the seriousness of BLM's errors overstate relevant facts and misapply relevant case law. *See* Pls.' Opening Remedy Brief ("Pls.' Brief") at 3-4, ECF No. 52. Plaintiffs argue, for example, that "BLM conducted no analysis of how this particular lease sale would harm sage-grouse and big game." *Id.* at 3. In fact, the Court's findings were more nuanced. As the Court noted, BLM "exhibited significant concern for the sage grouse's welfare

1

when filtering parcels based on the habitat designation and then deferring all parcels located in [Priority Habitat Management Area ("PHMA")]." Mar. 22, 2024, Mem. Op. and Order at 39 ("*Wilderness Society* Mem. Op."). Where BLM's analysis fell short was in its "inadequate discussion of how drilling on these parcels will affect sage grouse in light of developments since the Plan Amendments were issued in 2015." *Id.*

Similarly, the Court faulted BLM for not conducting sufficient forecasting of the impacts of the lease sale on mule deer and other big game. *Id.* at 43. But what the Court found lacking was the agency's explanation, not its underlying decision. Indeed, the Court stated, "The Court suspects BLM very well may conclude that the small magnitude of habitat affected, combined with the mitigation measures it imposed, provide assurance that the lease sales will not significantly impact big game." *Id.* Because BLM may be able to provide the explanation that the Court found lacking on remand, remand without vacatur is appropriate. *See Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022).

Plaintiffs place great weight on *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022), *vacated as moot*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023), but that decision bears no weight given its vacatur, and in any event the circumstances of the *Friends of the Earth* case were different. In that case, the environmental plaintiffs successfully argued that the Bureau of Ocean Energy Management's ("BOEM") analysis of greenhouse gas ("GHG") emissions and climate change was inadequate because BOEM's modeling had not adequately accounted for a change in foreign emissions caused by an increase in demand for oil and gas based on the lease sale. *See Friends of the Earth*, 583 F. Supp. 3d at 139-44. Further, BOEM had used the same modeling for prior projects, and that same modeling had been found to be inadequate in two prior cases. *See id.* at 137-38 (discussing *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d

723 (9th Cir. 2020), and *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:20-cv-00290, 555 F. Supp. 3d 739 (D. Alaska Aug. 18, 2021)). The court also found that BOEM had sufficient information in its possession to quantify the change in foreign consumption associated with the lease sale. It was in that context that the court concluded BOEM had "entirely failed to consider an important aspect of the problem." *Friends of the Earth*, 583 F. Supp. 3d at 141 (quoting *State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983)). And all those same circumstances contributed to the court's conclusion that the seriousness of the legal errors weighed in favor of vacatur. *See id.* at 157-58.

  Here, the circumstances are far different. Instead of a fundamental error in the agency's analysis, the Court found a few, discrete issues regarding BLM's NEPA analysis out of the many that were raised in this case and in the companion case. *See generally Wilderness Society* Mem. Op.; *Dakota Res. Council v. U.S. Dept. of the Interior*, No. 22-cv-1853 (CRC), ECF No. 85 ("*Dakota Res.* Mem. Op."). In each of the instances where the Court found a legal violation of NEPA, the Court's language suggested that BLM *would* be able to address the error on remand through additional explanation. *See*, *e.g.*, *Wilderness Society* Mem. Op. at 25 (BLM "was required to respond to . . . credible evidence that appeared to undermine its heavy reliance on federal and state regulations"), 43 ("[I]t is [BLM's], not the Court's responsibility to offer this reasoning based on all the information at hand."), 57 (stating, regarding BLM's analysis of GHG emissions, "That's a fine conclusion to reach if the Bureau can justify it. But it must show its work and explain its reasoning."). There is nothing in the Court's opinion that suggests that BLM could not justify its leasing decision through additional explanation on remand.

  Nevertheless, Plaintiffs argue that "[t]his is not a case where BLM's NEPA violation can readily be 'cured by further explanation on remand.'" Pls.' Br. at 5 (quoting *NRDC v. Coit*, 597

3

F. Supp. 3d 73, 95 (D.D.C. 2022)). But *Coit* is of no help to Plaintiffs' arguments; the court in that Endangered Species Act ("ESA") case did not vacate the agency's listing decision and instead ordered the agency to conduct additional analysis on remand. *See Coit*, 597 F. Supp. 3d at 95. And other referenced cases are unhelpful because they involve scenarios where the presiding court concluded the defendant agencies could not cure the legal errors through additional explanation on remand (a finding this Court did not make). *See Ctr. for Biological Diversity v. Regan*, Civ. A. No. 21-119 (RDM), 2024 WL 1602457, at *40-43 (D.D.C. Apr. 12, 2024) (vacating a biological opinion and incidental take statement based on violations of the ESA); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163-64 (D.D.C. 2002) (vacating a livestock grazing permit where the Forest Service had failed to prepare an environmental assessment before issuing the permit).[1]

Turning to groundwater issues, *see* Pls.' Br. at 6-8, Plaintiffs argue that vacatur is warranted because the Court found that BLM had failed to respond to evidence (the Tisherman Study) that raised questions about future adherence by oil and gas operators to federal and state groundwater standards. *See id.* at 6-9. In their merits argument, Plaintiffs relied heavily on the principle set forth by the D.C. Circuit that, if there is credible evidence regarding non-

---

[1] Plaintiffs assert that, "[w]hen assessing the seriousness of such errors, the inquiry is not whether the agency will eventually be able to comply with NEPA on remand, but whether BLM can show that *its original analysis complied with NEPA and the APA*." Pls.' Br. at 5 n.1 (citing *NPCA v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019)) (emphasis added). Under that theory, any legal violation would result in vacatur, but Plaintiffs are mistaken and their contention finds no support in the two referenced cases. They rely on language stating that, where an agency decides not to prepare an EIS, the court may consider "the deficiency of the determination that *an EIS was not warranted*." *NPCA*, 422 F. Supp. 3d at 99 (emphasis added). This point is irrelevant here because the Court has already *upheld* BLM's decision not to prepare an EIS. *See Dakota Resources* Mem. Opp. at 41-50. In *Friends of the Earth*, the court found that, because the flaws in the modeling were so severe, the agency would not be able to reach the same leasing decision on remand. *See* 583 F. Supp. 3d at 158. For the reasons discussed above, BLM's NEPA errors here were not as serious, and BLM can reach the same leasing decision on remand.

4

compliance with applicable regulations, an agency cannot rely on compliance with such regulations without providing additional explanation. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803-04 (D.C. Cir. 2022). But that case supports remand without vacatur here because there the court did not vacate the offshore oil and gas lease sale at issue; it instead remanded without vacatur. *Id.* at 804-05. Regarding the seriousness of the legal error, the court stated that "the environmental groups have given us no reason to doubt that BOEM itself can make the same case on remand." *Id.* at 805. The same is true here.

Further, contrary to Plaintiffs' suggestion, *see* Pls.' Br. at 7, this is not a case where Plaintiffs repeatedly brought the Tisherman Report to the agency's attention and the agency ignored it. Instead, as explained in the Court's opinion, the Tisherman Report was not even published until the protest period, which occurred well after the public comment period on the Draft Environmental Assessment ("EA") for the Wyoming leasing decision. *Wilderness Society* Mem. Op. at 23. The Court rejected the government's argument that this late presentation of the report relieved BLM of the obligation to provide a response, but the fact that it was presented so late in the process weighs in favor of allowing BLM additional time to consider the evidence presented in the Tishermen Report and to respond to it.

This is also not an instance where the agency has already had an opportunity to address a NEPA violation on remand and again fallen short. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) ("[T]he district court concluded that the Corps was unlikely to resolve the controversies on remand because the court had previously remanded without vacatur for just that purpose and the Corps had nonetheless failed to resolve them."). Plaintiffs suggest that BLM should have been on notice regarding the issues in the groundwater analysis based on court rulings in other cases that relate to groundwater. *See* Pls.'

5

Br. at 7 (citing *Richardson v. BLM*, 565 F.3d 683, 715 (10th Cir. 2009); *WildEarth Guardians v. BLM*, 457 F. Supp. 3d 880, 885 (D. Mont. 2020)). But given the salience of the Tisherman Report to the court's ruling in this case, *see Wilderness Society* Mem. Op. at 22-23, merely the fact that there are other cases involving groundwater does not mean that BLM was "on notice" of the legal violations that the Court ultimately found in this case.

Turning finally to Plaintiffs' climate-based arguments, *see* Pls.' Br. at 8-9, Plaintiffs argue that vacatur is warranted because the Court found that BLM had failed to "assess the merits and demerits of the proposed action" with reference to the associated greenhouse gas emissions and their social cost. But they disregard that the Court rejected most of the Plaintiffs' arguments regarding climate change in the consolidated cases, including claims that BLM had failed to analyze the cumulative impacts of GHG emissions and had failed to prepare an EIS. *See Dakota Resources* Mem. Op. at 21-50. Even in this case, the Court rejected Plaintiffs' arguments regarding compliance with administration policies and BLM's finding of no significant impact ("FONSI"). The Court agreed only with Plaintiffs' argument regarding the role that disclosed GHG emissions (and their estimated social cost) should play in BLM's decision process. *See Wilderness Society* Mem. Op. at 52-58. That makes this case much different from *Sovereign Inupiat*, 555 F. Supp. 3d at 804, and *Friends of the Earth*, 583 F. Supp. 3d at 158, where the courts found a fundamental flaw in the agency's NEPA analysis that had been repeated in multiple analyses and had been found to be inadequate by multiple courts.

Finally, Plaintiffs assert that the "multiple mistakes made by BLM underscores their seriousness." Pls.' Br. at 8. But they ignore the fact that the Plaintiffs in the consolidated cases brought many claims, and the Court rejected most of them, including the most serious ones. For example, the Court did not find BLM's FONSI to be invalid, *see Dakota Resources* Mem. Op. at

6

41-50, and it rejected two out of the three arguments that Plaintiffs made regarding groundwater impacts. *See Wilderness Society* Mem. Op. at 10-32. BLM's analysis withstood most of the Plaintiffs' claims, and it should be permitted a remand without vacatur to provide further explanation to address the few deficiencies that the Court found. *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) ("BLM's NEPA violation consists merely of a failure to fully discuss the environmental effects of those lease sales; nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs.").

## II.     Vacating the Leasing Decision and the Leases Would Have Disruptive Consequences

The second factor that the Court should consider in determining whether to vacate an agency action is "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150-51 (citation omitted); *see also Standing Rock*, 985 F.3d at 1051. Plaintiffs' put their own gloss on this standard by asserting that the Court should "consider whether [vacatur] would restore something approaching the prior status quo." Pls.' Br. at 9. To be sure, in some cases, vacatur may not be feasible, such as where crops have already been plowed under. *See Sugar Can Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("The egg has been scrambled and there is no apparent way to restore the status quo ante."). But there is no legal support for Plaintiffs' contention that vacatur should occur whenever "the egg is not yet scrambled." *See* Pls.' Br. at 9. Restoring the status quo ante is not an end in itself, and in determining whether to vacate, the Court should consider the disruptive consequences of vacating a lease sale that, if vacated, may be held again.

Plaintiffs argue that because no drilling has occurred on the lease parcels, vacating the lease sale and the leases will not be disruptive. *See id.* As already demonstrated, if BLM

7

reached the same leasing decision on remand, it would need to go through the leasing process again.  *See* Decl. of Erik Norelius ¶ 7, ECF No. 50-1.  In that scenario, the prior bids would be matters of public record, meaning that other companies could use that information in formulating their bids, putting the existing lessees at a disadvantage.  *Id.*  Moreover, the amount of the bids could differ, and some companies may choose not to bid at all, which could change the amount paid to the United States.  *Id.*  All these things would be disruptive.

Plaintiffs argue that the lessees were aware of the lawsuit and the potential litigation risk at the outset of the lawsuit based on letters that Plaintiffs sent them.  *See* Pls.' Br. at 10.  Thus, they argue that the vacatur of the leases will result in "no unfair prejudice" to the lessees, especially since none of the leases have been developed.  *Id.* at 10-11.  For this proposition, they cite a case involving a dispute under the Mineral Leasing Act regarding which entity was the bona fide purchaser of a lease, *Winkler v. Andrus*, 614 F.2d 707, 711-15 (10th Cir. 1980), as well as a case involving a funding agreement between the Department of the Interior and multiple tribes.  *Reed v. Salazar*, 744 F. Supp. 2d 98, 115-20 (D.D.C. 2010).  These cases are irrelevant.

In more pertinent cases involving prior oil and gas lease sales, courts have noted the potentially disruptive effects of vacating the subject lease sales, including the potential impacts on the State of Wyoming's budget from the state having to return a portion of the bonus bid revenue.  *See W. Watersheds Project v. Zinke*, No. 1:18-cv-187-REB, 2020 WL 2462817, at *4 (D. Idaho May 12, 2020) (staying vacatur pending appeal due to potentially disruptive effects); *Mont. Wildlife Fed'n v. Bernhardt*, No. 4:18-cv-69, 2020 WL 11897220, at *2-3 (D. Mont. Aug. 25, 2020) (same).  Similar disruptive consequences would occur here, and therefore the Court should not vacate BLM's leasing decisions and associated leases.  *See W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 996 (D. Idaho 2021) ("[D]espite their NEPA-related

8

shortcomings, the Court will not vacate the Phase Two lease sales.").

### III. Vacatur Is Not Mandated in NEPA Cases, and Harm to the Environment Can Be Avoided Through Narrowly Tailored Injunctive Relief

Plaintiffs argue that vacating the leases would serve the purposes of NEPA because, without vacatur, BLM would feel pressure to reaffirm its existing leasing decision. *See* Pls' Br. at 13. But there is no NEPA exception to the *Allied-Signal* test. If anything, the procedural nature of NEPA lends itself to remand without vacatur because an agency may be able, through additional explanation, to justify its original decision after the remand. *See, e.g., Gulf Restoration*, 47 F.4th at 805 (declining to vacate offshore oil and gas lease sale based on a NEPA violation because the agency could justify its decision on remand); *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (finding a NEPA violation, but declining to vacate because the court had "not been given any reason to expect that the agency will be unable to correct [the NEPA] deficiencies").

Plaintiffs' reliance on *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983), is misplaced. *See* Pls.' Br. at 13-14. In *Watt*, the First Circuit enjoined an offshore oil and gas lease sale, even in the absence of irreparable harm, out of concern that the leases, once issued, would create bureaucratic momentum to keep the leases in place even if the court later found a NEPA violation. *See id.* at 952-53. The Supreme Court has subsequently made clear, however, that harm to the environment may not be presumed in environmental cases. *See Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 544-45 (1987); *see also Winter v. NRDC*, 555 U.S. 7, 22 (2008) (a party seeking a preliminary injunction must demonstrate irreparable harm). Therefore, the Court should not vacate merely out of concern that BLM will not make a sound

leasing decision on remand.[2]

Plaintiffs also argue that environmental harm could occur if the leases are left in place. *See* Pls.' Brief at 14.  As demonstrated in Federal Defendants' opening brief, however, all harm to the environment, can be avoided by enjoining BLM from approving new applications for a permit to drill or authorizing new surface disturbance on the lease parcels during the remand, as in other recent cases.  *See WildEarth Guardians*, 368 F. Supp. 3d at 85; *W. Watersheds Project*, 543 F. Supp. 3d at 996.

## CONCLUSION

For the foregoing reasons and the reasons stated in Federal Defendants' opening brief regarding remedy, the Court should remand without vacating BLM's leasing decision, and if the Court deems it appropriate, enjoin BLM from approving new APDs or authorizing new surface disturbing activities on the subject leases pending completion of the remand.

Respectfully submitted this 14th day of June, 2024,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
Senior Attorney, Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202

---

[2] Plaintiffs argue that, in prior cases, BLM has not cancelled leases on its own volition following remand.  *See* Pls.' Br. at 13-14 & Decl. of Mike Freeman ¶¶ 5-11.  In fact, as Plaintiffs point out, BLM withdrew leases in the White River National Forest after an adverse NEPA decision in an IBLA case.  *See* Freeman Decl. ¶ 5.  And the fact that there are other instances where leases have been cancelled through settlement negotiations undermines Plaintiffs' argument that BLM will not reconsider its decision on remand.  *See id.* ¶ 9.  Finally, Plaintiffs' declaration speaks only to cancellation, and ignores that NEPA's policies are also served when an agency uses corrective NEPA analysis on remand to add mitigation for existing leases.

Tel.: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Counsel for Federal Defendants*