UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WILDERNESS SOCIETY,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. DEPARTMENT OF INTERIOR,** *et al.*, <br><br> Defendants. | Case No. 22-cv-1871 (CRC) |

## MEMORANDUM OPINION

In June 2022, the Wilderness Society and other conservation groups (collectively, "the Conservation Groups") filed this lawsuit challenging the Bureau of Land Management's ("BLM" or "the Bureau") decision to auction almost 120,000 acres of public land in Wyoming for oil and gas development. In its prior Memorandum Opinion, the Court held that the Bureau had failed to comply fully with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., when assessing the foreseeable environmental impacts of future drilling on the leased parcels and explaining its decision to authorize a lease sale of this magnitude in light of its own estimates of the steep social costs from the projected greenhouse gas ("GHG") emissions. See Wilderness Soc'y v. U.S. Dep't of Interior, No. 22-cv-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024). After awarding partial summary judgment in favor of the Conservation Groups, the Court solicited supplemental briefing on the following question: What is the proper remedy for these procedural deficiencies? Having reviewed the ensuing submissions, the Court finds that the appropriate remedy is vacatur without remand, accompanied by an injunction preventing the Bureau from approving new drilling permits on these leased parcels or authorizing new surface disturbing

activities until it completes its supplemental NEPA review within 180 days of the accompanying remand order.

**I.   Background**

The Court extensively detailed the background of this case in the last outing, see id. at *1–4, so it provides only a summary of the relevant details here.

In June 2022, BLM's Wyoming State Office finalized a lease sale for nearly 120,000 acres of land by issuing its protest decisions and posting the final environmental assessment ("EA"), a signed finding of no significant impact ("FONSI"), and a Record of Decision for the sale. See id. at *4. Wasting no time, the Conservation Groups filed this lawsuit that same day, raising a suite of challenges to BLM's environmental analysis and its authorization of such a sizeable sale. Id. In particular, the Conservation Groups raised four sets of challenges under NEPA and the APA. First, the Conservation Groups alleged that BLM did not perform a sufficiently granular analysis of impacts to groundwater and ignored the proven possibility that inadequate well casing or hydraulic fracturing near usable water sources may cause contamination. Id. Second, they claimed that the Bureau failed to take a hard look at effects on various wildlife—namely, the greater sage grouse ("sage grouse") and the mule deer. Id. Third, the groups maintained that the Wyoming Office failed to consider a reasonable slate of alternatives, as NEPA requires, when authorizing such a large-scale sale that far outstripped what the other BLM field offices put up for auction around the same time. Id. And fourth, they claimed the Bureau failed to rationally address climate impacts when deciding to offer a lease sale of this magnitude. Id.

The Court issued a split decision on the parties' dueling motions for summary judgment in March 2024. First, on the groundwater analysis, the Court agreed with BLM that it "was not

required to conduct a more fine-grained analysis at the lease stage" and that it had "not act[ed] arbitrarily when concluding, based on recent scientific studies, that any subsequent fracking on the leased parcels is unlikely to negatively impact usable water." Id. at *5.  By contrast, the Court held, "the Bureau erred by failing to address credible evidence suggesting that there may be inadequate enforcement of the well-construction regulations on which it relied when finding no significant impact to groundwater." Id.  Regarding wildlife, while it credited BLM's efforts to steer clear of critical sage-grouse and mule-deer habitats, the Court found that, for both species, the Bureau had improperly "tiered" its analysis to earlier environmental impact statements ("EIS") prepared during the planning phase rather than evaluating the foreseeable impacts of development on the leased parcels anew.  See id. at *14–19.  Moreover, for the sage grouse, the Court dinged the Bureau for overlooking "significant developments postdating its promulgation of" its resource management plans ("RMPs"). Id. at *14; see id. at *14–17.  Next, the Court held that the "Wyoming Office selected a reasonable range of alternatives to analyze in its EA—even if other field offices opted to pursue smaller lease sales in June 2022." Id. at *19.  Finally, with respect to climate impacts, the Court rejected the Conservation Groups' contention that BLM erred by failing to determine whether the climate impacts of the sale were significant and forgoing an EIS.  See id. at *23; see also Dakota Res. Council v. U.S. Dep't of Interior, No. 22-cv-1853 (CRC), 2024 WL 1239698, at *18–21 (D.D.C. Mar. 22, 2024) (rejecting the same argument in a companion case).  But while its climate analysis may have been sufficient, the Court found BLM's explanation of how that analysis informed its decisionmaking lacking.  More specifically, the Court held that "the Bureau did not adequately explain how it considered the environmental effects of GHG emissions that, in its own telling, carry a hefty price tag in terms of social costs." Wilderness Soc'y, 2024 WL 1241906, at *23.  The Bureau instead appeared to

disclaim any reliance on its prior GHG analysis when justifying its decision, thereby giving short shrift to what should have been an important factor in the calculus.  See id. at *23–24.

Having determined the Bureau fell short of its obligations under NEPA and the APA in some respects, the Court invited the parties to submit supplemental briefing on the appropriate remedy for these violations.  The Conservation Groups request that the Court "return the parties to the pre-lease sale status quo" by vacating the leases and the Record of Decision authorizing them.  Pls.' Br. at 1.  By contrast, the Bureau—along with the State of Wyoming and a trade association, Western Energy Alliance ("WEA"), which intervened to defend the sale[1]—asks the Court to remand the matter to BLM for further consideration without vacating the decision and cancelling the leases.

## II. Legal Standards

Under the caselaw of this Circuit, "vacating a rule or action promulgated in violation of NEPA is the standard remedy."  Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001)).  But while vacatur is the "presumptively appropriate remedy," it is not the only option.  Sierra Club v. Van Antwerp, 719 F. Supp. 2d 77, 78 (D.D.C. 2010).  Instead, as equity requires, the reviewing court has discretion to leave the agency action in place.  See, e.g., Advocs. for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) (remanding without vacatur); Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 966–67 (D.C. Cir. 1990) (same).

---

[1] Individual lessees were also provided notice and an opportunity to intervene in the remedy briefing, see Apr. 16, 2024 Min. Order, but none accepted the invitation.

The test for whether a court should vacate a deficient agency action during remand comes from the D.C. Circuit's decision in Allied–Signal v. U.S. Nuclear Regulatory Commission, 988 F.2d 146 (D.C. Cir. 1993). As Allied–Signal explained, "[T]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Id. at 150–51 (citation omitted). Put otherwise, this Court must determine whether there is "at least a serious possibility that the [Bureau] will be able to substantiate its decision on remand," and whether vacatur will lead to impermissibly disruptive consequences in the interim. Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 20 (D.D.C. 2014); Williston Basin Interstate Pipeline Co. v. FERC, 519 F.3d 497, 504 (D.C. Cir. 2008) (declining to vacate where there was a "significant possibility that the [agency] may find an adequate explanation for its actions"). "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." Shands Jacksonville Med. Ctr. v. Burwell, 139 F. Supp. 3d 240, 270 (D.D.C. 2015). "Rather, resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." Id.

"Because vacatur is the default remedy," however, "the defendant[] bear[s] the burden to prove that vacatur is unnecessary." Nat'l Parks Conservation Ass'n v. Semonite, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). This thumb on the scale in favor of vacatur weighs particularly heavy in the context of NEPA, which is designed to compel agencies to "take the required hard look *before* taking [the proposed] action." Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n, 896 F.3d 520, 532 (D.C. Cir. 2018) (emphasis in original). "The default rule of vacatur thus serves to avoid creating perverse incentives for the agency to press forward with a faulty decision and fill in its analysis later." Friends of the Earth v. Haaland, 583 F. Supp. 3d 113, 156 (D.D.C. 2022),

vacated and remanded on other grounds, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). But that presumption is not insurmountable, even for NEPA infractions, as district courts retain "discretion to leave agency action in place while the decision is remanded for further explanation." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quotation marks omitted).

### III. Analysis

As previewed in the Court's summary-judgment decision, though the Bureau may have come up short in its initial analysis, there is a "serious possibility" that it will be able to cure those deficiencies on remand and justify its decisions to issue a FONSI and authorize the lease sale. And while the disruptive consequences of vacating the lease decision may not register all that high on the proverbial Richter scale, there would undoubtedly be some disturbance if the Court were to cancel already consummated lease sales, order that the Department of Interior and Wyoming return the profits to companies that have already begun devising drilling plans for their parcels, and mandate that the Bureau restart from square one. Because this disruption may well prove entirely unnecessary, the Court finds that vacatur is not the appropriate remedy here. Still, to avoid any environmental harm while the Bureau revises its NEPA analysis, the Court will require that the Bureau pause approval of any new drilling permits or surface disturbing activities on the leased parcels during remand. And to ensure that this temporary injunction does not carry on indefinitely, the Court will direct the Bureau to complete its supplemental review within 180 days of issuance of the accompanying remand order.

#### A. Seriousness of Deficiencies

The first prong of the Allied–Signal test requires the Court to determine the "seriousness" of the deficiencies in the underlying agency action. The seriousness of the agency's errors "is

determined at least in part by whether there is a significant possibility that the [agency] may find an adequate explanation on remand" and thereby reach the same result. Standing Rock, 985 F.3d at 1051 (quotation marks omitted). In the NEPA context, the Court must assess not only whether the deficiency undermines confidence in the ultimate decision itself—*i.e.*, the decision to auction the leases—but also whether these errors call into question the agency's determination that an EIS was not warranted because the proposed action will not cause significant environmental impacts. See NPCA v. Semonite, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). Here, while the Court identified several shortcomings in BLM's analysis underlying its FONSI and justification for its decision, the Court harbors little doubt that the Bureau can correct these missteps on remand and end up in the same place.

As recounted above, the Court faulted the Bureau three times over for (1) sidestepping credible concerns about inadequate enforcement of well-casing regulations; (2) not adequately discussing how drilling on the leased parcels will affect mull-deer and sage-grouse populations, especially in light of recent science that may upend some assumptions behind the existing RMPs; and (3) failing to explain how its estimates of GHG emissions and the accompanying social costs factored into its decisionmaking. None of these errors are so grave as to warrant vacatur.

Starting with the groundwater analysis, the Court rejected the Conservation Groups' more expansive critiques that the Bureau had failed to perform the requisite fine-grained analysis at the leasing stage and overlooked evidence that hydraulic fracturing on those parcels is likely to contaminate usable water sources. See Wilderness Soc'y, 2024 WL 1241906, at *5–8; 12–14. Instead, the Court found in favor of the Conservation Groups only on the narrower issue of whether BLM had failed to respond to "credible" evidence suggesting there *may* be inadequate enforcement of well-construction regulations in Wyoming, which, under the D.C. Circuit's

7

decision in Gulf Restoration Network v. Haaland, 47 F.4th 795 (D.C. Cir. 2022), the Bureau was required to address. See Wilderness Soc'y, 2024 WL 1241906, at *8–13. In doing so, the Court acknowledged that the evidence of lax regulatory enforcement was far from conclusive, as the Bureau had explained in its briefs. See id. "Because the Bureau [could not] correct the record by rebutting this evidence in the throes of litigation," however, the Court held that it "must award summary judgment to the Conservation Groups on this score." Id. at *11. That does not mean that vacatur is the proper remedy though. For the reasons that BLM presaged, it appears likely that, on remand, the Bureau will be able to explain why this evidence does not undermine its position that the lease sale will not negatively affect useable water sources. Therefore, again following the Circuit's lead in Gulf Restoration Network, the Court does not believe that this failure to address evidence of potentially loose regulatory enforcement warrants setting aside the lease sale. See 47 F.4th at 805 (declining to vacate where agency's attorneys made "a colorable case that the [evidence] ultimately should not change the bottom line" and "the environmental groups have given [the court] no reason to doubt that [the agency] itself [could] make the same case on remand").

The same is true for the Bureau's treatment of GHG emissions. There too, the Court rejected the Conservation Groups' more expansive argument that the Bureau erred by issuing a FONSI because, given the high level of projected GHG emissions, a full-scale EIS was needed before auctioning the parcels. See Wilderness Soc'y, 2024 WL 1241906, at *23. This is, accordingly, not a case where the agency decided to "forgo a major procedural step in its path to its ultimate action." Standing Rock, 985 F.3d at 1052. There was no deficiency with the Bureau's NEPA analysis here; rather, the problem was only that the Bureau did not sufficiently explain how that analysis of the projected GHG emissions factored into its decision to authorize

the lease sale. See Wilderness Soc'y, 2024 WL 1241906, at *23–26. But again, the Court has scant reason to doubt that the Bureau will be able to "show its work and explain its reasoning" while reaching the same result on remand. Id. at *25.

The errors in the Bureau's assessment of the foreseeable effects on wildlife are slightly different in flavor, but the outcome is the same regardless. For both the sage grouse and the mule deer, the Court found that the Bureau had improperly "tiered its review to a set of RMPs that do not contain the missing links" because "those higher-level assessments do not offer any insight into how a lease sale of this magnitude and in these particular areas will likely affect these species." Id. at *15, 18. Once more, though, the Court did not find that the Bureau had abdicated its NEPA responsibilities or completely ignored the effects that the oil leases might have on these species. The record instead indicated that the Bureau had done a good deal to document and limit the impacts on these critters. For the mule deer, for instance, the Bureau carefully filtered parcels that overlapped with its habitat and eventually offered only 50,945 out of over 16.6 million acres of crucial winter range. Id. at *18. Accordingly, the Court noted that "BLM very well may conclude that the small magnitude of habitat affected, combined with the mitigation measures it imposed, provide assurance that the lease sales will not significantly impact big game," but resolved that it was the Bureau's, and not the Court's, responsibility to explain why that is so. Id. at *19; see also id. at *17 (noting BLM "exhibited significant concern for the sage grouse's welfare when filtering parcels based on the habitat designation and then deferring all parcels located in" priority habitat management areas). Thus, even when holding that BLM had more explaining to do, the Court recognized that the Bureau potentially could "arrive at the same finding of no significant impact" on remand. Food & Water Watch v. FERC, 28 F.4th 277, 292 (D.C. Cir. 2022). The Bureau's failure to engage with "new science"

9

indicating that the sage grouse might be fairing worse than previously projected is, admittedly, more concerning.  See Wilderness Soc'y, 2024 WL 1241906, at *15–17.  The Bureau, of course, cannot perform the "hard look" NEPA demands while turning a blind eye to intervening scientific data that casts doubt on the rosier outlook that once prevailed.  It instead must bring this new data into full view.  But even here, given the Bureau's extensive efforts to screen out critical sage-grouse habitat from the leased parcels, there is a decent likelihood that it could justify its FONSI on remand.

For each of these deficiencies, then, there is a "serious possibility that the [agency] will be able to substantiate" its FONSI and decision to approve the lease sale on remand.  See Nat'l Parks Conservation Ass'n, 62 F. Supp. 3d at 20.  That remains true even when these errors are viewed collectively, rather than in isolation.

The Conservation Groups protest that the "relevant question is not whether the Bureau 'can remedy any deficiency on remand,' but rather whether it can 'retroactively justify' its decision to ignore 'an important aspect of the problem.'"  See Pls.' Br. at 5 n.1 (quoting Friends of the Earth, 583 F. Supp. 3d at 157 (cleaned up)).  Hence, in their telling, the fact that the Bureau cannot justify its earlier oversights and instead must conduct additional NEPA analysis on remand conclusively shows that the deficiencies here are "serious" and demand vacatur.  The Court disagrees.  There is no disputing that NEPA is intended to ensure agencies "look before they leap," or that this purpose can be undermined when agencies act first and assess the impact later.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 471 F. Supp. 3d 71, 85 (D.D.C. 2020), rev'd in part on other grounds, 985 F.3d 1032 ("When it comes to NEPA, it is better to ask for permission than forgiveness: if you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite.").  That's why the presumption

is in favor of vacatur. But that presumption does not mean that vacatur is required in every case where additional NEPA analysis is needed. On numerous occasions, courts in this jurisdiction have remanded without vacatur even when the agency had to perform additional NEPA analysis to justify its decision to approve a proposed action without first preparing an EIS. See, e.g., WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 83–85 (D.D.C. 2019) (remanding without vacatur where BLM failed to sufficiently consider climate impacts when authorizing leases); Standing Rock, 282 F. Supp. 3d 91, 92–103 (D.D.C. 2017) (same when NEPA analysis was deficient on multiple scores). For good reason. As the D.C. Circuit has made clear, the relevant inquiry is whether the agency can justify its issuance of a FONSI and decision to proceed with the proposed action on remand. Standing Rock, 985 F.3d at 1051–52 ("[T]he question is whether the [agency] is likely to justify its issuance of a FONSI and refusal to prepare an EIS."); Food & Water Watch, 28 F.4th at 292 (echoing this test).

Here, there is ample reason to believe that the Bureau will be able to cure the deficiencies in its prior NEPA analysis and justify its decisions to issue the FONSI and approve the lease sale. The first prong of the Allied–Signal framework therefore counsels in favor of remand without vacatur.

### B. Disruptive Consequences

The second consideration in determining whether to remand without vacatur is "the disruptive consequences of an interim change that may itself be changed." Allied-Signal, 988 F.2d at 150–51. Although the effects of vacatur might not be all that dire here, the Court finds that this factor also leans slightly against setting aside the lease sale.

To date, no drilling has been approved on any of the leases—and only one application for a permit to drill ("APD") has been filed. BLM Br. at 8. The Conservation Groups thus contend

that, because no drilling has occurred on the leased parcels, the Court could restore the status quo ante with minimal disruption by revoking the lease sale. See Pls.' Br. at 9. Yet even if no one has broken ground, cancelling an already inked lease sale would have real-world repercussions for interested parties. The Bureau "devoted significant resources and time to prepare the affected lease sale," including soliciting and reviewing expressions of interest, responding to comments, coordinating with stakeholders, and conducting the auction. BLM Br., Ex. 1 ("Norelius Decl.") ¶ 4. Vacatur would erase much of that work and send the Bureau back to the drawing board. More than that, money has already changed hands. The lease sale netted more than $13 million, which was split about evenly between the federal government and the State of Wyoming. Id. ¶¶ 2–3. "If the leases were vacated, the revenue from the sale would need to be returned" to the lessees. Id. ¶ 6. Practically, that would require the Department of Interior to recall royalties from its own fisc and from Wyoming's coffers—revenue that has been built into budgets—to refund the lessees. See id. ¶ 6: Wyoming Br. at 5–6. That refund would not necessarily make existing lessees whole, however. These companies have invested more than just the money they paid for the parcels. "Prior to the lease sale, the lessees also performed substantial due diligence on their lease investments and made significant investments for the planning of exploratory and development activities." WEA Br. at 6 (citing id., Ex. 1 ("Sgamma Decl.") ¶ 15, and id., Ex. 2 ("Ballard Decl.") ¶ 16). After auction, the lessees have continued to pour resources into these lands as they gear up for the permitting and drilling phases. Id. at 6–7. All this time and effort could be jeopardized if these tracts were put back on the auction block, as the companies would have to rebid after already tipping their hands in the prior auction. See BLM Br. at 7 ("Those bids are now public records, meaning that other companies may use that information to bid on lease parcels, which puts the existing lessees at a disadvantage."). In other oil and gas leasing

cases, courts have cited these disruptive effects as a reason to leave existing leases in place while the government attempts to cure the deficiencies in its prior analysis. See, e.g., W. Watersheds Project v. Zinke, No. 1:18-cv-187, 2020 WL 2462817, at *4 (D. Idaho May 12, 2020); Mont. Wildlife Fed'n v. Bernhardt, No. 4:18-cv-69, 2020 WL 11897220, at *2–3 (D. Mont. Aug. 25, 2020).

To be sure, the magnitude of potential disruption may not be as great as in some other cases. But where, as here, the agency's errors are likely to be cured under the first prong, the agency need not make a particularly strong showing on the second. See Standing Rock, 985 F.3d at 1051–52. In those instances, "though the disruptive consequences of vacatur might not be great, the probability that the [agency] will be able to justify retaining [its prior decision] is sufficiently high that vacatur . . . is not appropriate." Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1049 (D.C. Cir. 2002), opinion modified on reh'g, 293 F.3d 537 (D.C. Cir. 2002). That's the case here. The disruptive consequences here might not be catastrophic, but they are far from nil. Thus, given the strong likelihood that the Bureau will be able to justify its FONSI and its decision to auction these tracts, this factor also weighs slightly against vacatur.

\*   \*   \*

In light of the "serious possibility" that the Bureau will be able to substantiate its prior conclusions and the disruptive effects of setting aside the existing leases, the Court finds that vacatur is not the appropriate remedy in this case. Nat'l Parks Conservation Ass'n, 62 F. Supp. 3d at 20.

The Conservation Groups warn that this outcome will create "perverse incentives for the agency to press forward with a faulty decision and fill in its analysis later." Friends of the Earth, 583 F. Supp. 3d at 157; see Pls.' Br. at 13. But the Court does not believe that this decision will

13

tap a gusher of defective environmental reviews. Proper application of the Allied–Signal test does not empower agencies to shirk their NEPA obligations. Where the errors are grave and there are significant doubts about the agency's decision to skip an important procedural step, courts should not hesitate to vacate the agency's action. But where, as here, the errors are less severe and the agency may well reach the same result on remand, the equities weigh against setting the action aside in the interim. The Conservation Groups also sound the alarm that leaving the lease sale intact "will create enormous pressure for BLM to reaffirm its original lease sale rather than making a fresh decision based on a full analysis of wildlife, groundwater, and climate concerns." Pls.' Br. at 13. The Bureau is free to make its own decision on remand after patching up the holes in its prior analysis, however. That includes both pressing ahead on its current path, or taking a different road.

With that said, the Court appreciates the Conservation Groups' argument that allowing drilling while the effects of this oil development are still being studied would be in tension with NEPA's animating idea that agencies should "look before they leap" into new projects that may have harmful environmental impacts. To alleviate that legitimate concern, the Court will follow the lead of other courts and enjoin the Bureau from approving new applications for a permit to drill or authorizing new surface disturbance on the lease parcels during the remand period. See, e.g., WildEarth Guardians, 368 F. Supp. 3d at 85; W. Watersheds Project v. Bernhardt, 543 F. Supp. 3d 958, 996 (D. Idaho 2021); BLM Br. at 8–9 (proposing this option). And to prevent this from morphing into an indefinite injunction that would potentially leave existing lessees in the lurch for the foreseeable future, the Court will direct the Bureau to complete its supplemental NEPA analysis, at the latest, within 180 days of the accompanying remand order.

### IV. Conclusion

For these reasons, the Court will remand this case to the Bureau, without vacatur, and enjoin the Bureau from approving new applications for a permit to drill or authorizing new surface disturbance on the leased parcels during the remand period, which shall be no more than 180 days.  A separate Order will follow.

                                                CHRISTOPHER R. COOPER  
                                                United States District Judge

Date: <u>July 16, 2024</u>